## CHRISTENSEN v. NATIONAL BRAKE & ELECTRIC CO.

(District Court, E. D. Wisconsin. August 14, 1924. Supplemental Opinion March 2, 1926.)

1. Patents ⬤☞328—Christensen 635,280, for combined pump and motor, held not infringed.

In the Christensen patent, No. 621,324, as corrected by No. 635,280, for a combined pump and motor, as construed by the trial and appellate courts, compactness of the structure is an essential feature of the invention, and as so construed the patent held not infringed by a new structure of defendant, brought into the case on accounting before a master.

2. Patents ⬤☞318(6)—Determination of invested capital on accounting for profits.

In determining invested capital as a basis for computing interest and depreciation on an accounting for profits made by an infringer, the ordinary measures of value are to be applied, and the fact that defendant bought its plant

and equipment at bankrupt sale, for much less than its actual value, does not make the purchase price the sole measure of its invested capital nor debar it from showing the actual value of the property employed in its business.

3. Patents ⬤☞318(6)—Taxes and insurance allowable to infringer on accounting for profits.

On an accounting by an infringer for profits, taxes and insurance premiums paid stand on the same footing as interest on capital invested and are allowable as charges against gross profits.

4. Patents ⬤☞318(1)—Liability of infringing manufacturer for manufacture and sale of repair parts.

On an accounting for profits by the manufacturer of infringing machines, defendant cannot be charged with profits from making and selling repair parts, unless on the ground of contributory infringement, and on proof that such parts were used as repairs or replacements on infringing machines, their manufacture and sale being no part of the original infringement by making and selling the completed machines.

5. Patents ⬤☞318(2)—Complainant entitled to finding of both damages and profits against infringer.

While a complainant cannot recover both damages and profits from an infringer, where either, awarded him, affords full compensation for the infringement, he has the right of choice between them and is entitled to a finding of both.

6. Patents ⬤☞322—Accounting for profits by infringer.

Whether patterns and drawings made and kept by the manufacturer of infringing machines should be regarded as items of expense on an accounting for profits, or valued as assets, is a question of fact to be determined on each case.

7. Patents ⬤☞318(1)—Infringer is accountable for profits though enhanced by "improvements" of the patented structure.

Though an infringer claims to have "improved" the patented structure, so long as he is within the inhibited field he is still infringing; and if by his improvements he has enhanced his sales and profits, he is still exercising the patentee's rights and is accountable for the profits.

8. Patents ⬤☞322—Infringer held to have burden of proving right to segregation of profits.

Where an infringer on an accounting for profits claims to have commingled other elements with those of the patented combination, he has the burden of proving such facts as entitle him to a segregation of profits.

### Supplemental Opinion.

9. Patents ⬤☞318(3)—As respects liability of infringing manufacturer, "profits" are determined by principles applicable to noninfringing situations.

On an accounting for profits by infringing manufacturer, "profits" are determined by same principles that determine profits or loss in noninfringing situations, and neither patentee nor

infringer can select methods of calculation, thereby to cast infringing units into or out of realm of profit or of loss, to augment or mitigate liability.

**10. Patents ⬥318(6)—Variable overhead cannot be allocated per unit of infringing product, to make sales appear unprofitable.**

On accounting of profits by infringing manufacturer, where manufacture or selling is continuous, having constant direct costs and variable overhead and selling prices, the variable overhead cannot be averaged or allocated per unit, for the purpose of making sales at lowered prices appear unprofitable.

In Equity. Suit by Niels A. Christensen and the Allis-Chalmers Company against the National Brake & Electric Company. On exceptions by both parties to master's report on accounting. Exceptions sustained in part.

Lines, Spooner & Quarles, of Milwaukee, Wis., Joseph B. Cotton, of New York City, and Wm. R. Rummler, of Chicago, Ill., for plaintiffs.

Brown, Boettcher & Dienner, of Chicago, Ill., for defendant.

GEIGER, District Judge. It is difficult, in a written opinion, to deal with all exceptions assigned upon the master's report. The views given upon the principal contentions will justify the court in declining to restate the account, howsoever desirable that might ordinarily be. If, upon the rulings now to be made, the parties and the master can recast the account without further testimony, I am confident that they can do it far more readily than can the court. In any event, the court will leave parties first to determine whether either side may desire to amplify the showing of the record.

[1] I shall consider first the contention of the defendant respecting the alleged unwarranted scope of the account because of the inclusion of the so-called "industrial compressors." Manifestly, it must find its support, if at all, in the original decree and record, wherein is exhibited the law of the patent as indicating what is to be included, and what, of necessity, is thereby excluded from the legal right of the patentee, what is within, and what is without, the legal liability of the alleged trespasser upon that right.

It ought to be regarded as elemental that if, upon the contest respecting validity (scope) of the patent in suit and its infringement, the court was called upon to consider the art, and that such consideration upon the decision of either issue resulted in giving the patent either breadth or narrowness, it is no longer open to the defendant to exclude structures identical with—or at least not more than colorably variant from those which

were before the court on either issue. Nor is it open to the plaintiff to include structures which the court must have considered as excluded in order to give effect to or save the patent in view of the art. And this brings us necessarily to an interpretation— not a reconsideration—of the decree for the purpose of determining whether it can include the so-called "industrial compressors." In performing this task recourse must be had to the record as disclosing the court's views in point of law upon the facts which it found, which views presumably furnish the foundation for the decree.

It thus appears that the court, in deciding the case, said: "The patentee expressly claimed novelty in 'features of construction and arrangement of parts' to accomplish the 'main object' of providing, 'within small compass or in compact form, a combined pump and motor of simple and durable construction that will not be affected by dust, mud, ice or snow, that will be efficient and economical in operation and that will require little attention,' and, further, a structure 'designed particularly for use in connection with air-brakes for railway cars in which the pump and motor are usually exposed to dust, mud and snow and the working parts, if unprotected, soon become worn and inoperative, besides requiring constant and frequent attention.' "

After referring to certain testimony in the case, which paid a tribute to the combination because of its compactness, its adaptability to hang from the bottom of the car, to be capable of operation by the same means as the car itself, etc., the court continues: "Thus, it was generally conceded that prior to Christensen's application, there were known in the art, mechanisms such as a combined pump and motor; a pump actuated by an electric motor; a pump whose working parts are enclosed, and protected from dirt; a combination of a frame or case formed or provided with a closed chamber adapted to exclude dirt; a shaft having bearings in the frame or case and provided with a crank within the chamber; a cylinder formed with or attached to the frame or case; a piston fitted to work in the chamber and connected to the crank or eccentric, and a shaft mounted on the frame or case and connected by gearing with the crank shaft; and steam engines having a crank case and the general combination of parts last noted in whose operation splash lubrication was practiced. These, it is claimed, are, generally speaking, the elements or parts of the patented structure, which, being known, were aggregated by complainant."

It will hardly do at this time to even at-

tempt to recede from the forecast contained in these quotations, namely, that the controversy was tending toward adjudication which, if for the plaintiff, could in no event give the structure of the patent the quality of great, or, as it is sometimes called, "pioneer" scope or breadth. The suggested defenses of aggregation, the elements being conceded, immediately drove the patent to other grounds upon which it could seek the support of novelty; and that all of the courts which have passed upon the issue seem to have found such ground and characterized it as, in essence, the compactness, the ingenuity of arrangement, and the like, which justified a finding of novelty and utility in a new, though limited, field, seems impossible to gainsay.

So this court, speaking by way of conclusion upon the controversy, thus sharply waged, said: "The patentee addressed his attention, not to the problem of combining a pump and motor, not to the mere matter of choosing from the art the several elements theretofore introduced which, when combined, would produce the results of combination; but rather to produce a combination for that purpose and adaptable for use in a new and expanding field. It is fair that he be permitted now to assert that the field wherein his structure has proven a great success was before him when his efforts to produce the combination were being exerted. To say that, because the idea of compactness is not referable to inventive genius; that a combined pump and motor was known; that splash lubrication was not new; that the other elements are found in known mechanism; that because any suggestion of invention not drawn from the prior art cannot be precisely pointed out, therefore the structure is a mere aggregation which any one possessing the skill of one competent in the calling might have assembled, begs the question at issue, and would preclude invention in most combination improvements. The defendant entered the field after the patented structure had achieved success and recognition. In its efforts to accomplish the same desired result, it has adopted, not only the idea of the combination, but almost exactly, its size, form and dimensions of parts. This in itself involves recognition by the defendant, not only of the combination, but also of its utility."

Testing out directly the contention of the defendant upon these industrial compressors, we cannot lose sight of the fact that the claim upon the original hearing respecting infringement was limited to structures before the court between which and the patent struc-

ture the court considered but few differences that were even claimed to take the former out of the range of fair identity. The court considered them—at least the alleged infringing structures—upon comparison with the patent structure as having not only the same objective (in point of use), "but, almost exactly its size, form and dimensions of parts." And the court observed that upon the issue of infringement this involved the defendant's recognition, not only of the combination, but also of its utility. With this as the situation which furnished the basis for the judgment herein, I conceive that it is entirely fair, in testing out the present contention of the defendant, now to ask, and to answer as best we may, upon the original hearing, and in the light of the grounds upon which inventive novelty was assigned to the patent, what would have been the view of the court had there been brought before it, and sought to be subjected to the charge of infringement, the industrial compressors, which, without exception, show the absence of every structural feature and quality, viz., compactness and the like, upon which the original findings of validity and infringement were based? I do not mean that, if this question could be answered favorably to the plaintiff, that such structures would then have been held to be infringing, must alone conclude the defendant from now insisting that the court has no right to answer the question at all. But, applying the test in a way most favorable to the plaintiff, and recognizing that the court then had before it, as structural subject-matter, a combined pump and motor with encasement and arrangement making it so compact that its high adaptability to use of railway cars proved to be the turning point upon which inventive novelty was accorded to it, it seems impossible to believe that with those limitations in mind it would at that time have been held that an industrial compressor nearly twelve feet long, four feet wide, and eight feet high, would likewise respond to the conception which the court was willing to recognize.

Whether either this court or the appellate court misconceived the art in disposing of what was really a defense of aggregation; whether the defendant mistakenly failed to bring before the court the entire art—the fact is plain that both this court and the appellate court conceived the necessity, in order to declare the law of the patent—that is to say, also its scope—to rest the decision of patentable novelty upon the phase of the structure referred to, viz., compactness, adaptability for a particular use, arrange-

ment of parts, etc., etc. To my mind, nothing in the record gives greater emphasis to this than the attitude of the Court of Appeals in passing upon claim 2. The latter, as may be now clearly seen, in the trial court, received no special attention in the consideration of the case, that is, it was not separated and dealt with upon either issue of validity or infringement as a claim exhibiting a single pump—rather than a combined pump and motor structure or mechanism. But apparently in the Court of Appeals, this phase of the case was pressed by one side or the other for more serious consideration upon the record, and was dealt with by the Court of Appeals—and this must be assumed to be a finding upon the facts and the law now binding upon this court—viz.:

"The compact form of structure necessitated by the use for which complainants' device is primarily designed makes the complainants' arrangement of the parts essential; Ward's machine, designed for a totally different purpose, enables him to locate the gearing, which connects the driving shaft and the crank shaft between the bearings, at the middle instead of the end of the shaft, and to place the cranks at the ends."

"(cc) As to invention: The line between mechanical and inventive genius is often difficult to draw. This structure met a great need; highly skilled engineers familiar with the old elements failed thus to utilize them; the bringing of them together in this compact, ingenious form concededly amounted to invention. True, this applies to the combination of motor and pump; claim 2 is limited to the pump alone. The pump, however, necessarily requires some motive power; for the purposes for which it was primarily designed, the electric motor obviously was the only one that would be selected. The combination of,

" '(a) an oil holding, gear enclosing case in which the one end of the crank shaft terminated and by which it was protected, dispensing with the undesirable stuffing box, and

" '(b) the compressor case with its parts so arranged as to utilize the oil for both lubricating and cooling purposes, if the motor should be attached to the pumps as stated in the other claims,'

—united in such a way as to secure the highly desirable compactness, ready accessibility to the parts, and adaptability, through their possible connection, to the flow of the same lubricant from one to the other, or by their possible separation, to the use of a different lubricant for each of them, required more

than mere mechanical skill. No pump is shown to have anticipated Christensen's; none was adapted to this particular service, or had all of these functions; the utilization of old elements for this new form of construction to meet this specific need was, in our judgment, an exercise of inventive genius."

The significance of this estimate of claim 2, so it seems to me, rests in the limitations imported into it, really the limitations of the combinations found in the other claims. The limitations as stated, of a union of *the* or *some* indispensable motor "in such a way as to secure the highly desirable compactness, ready accessibility to the parts, and adaptability." And all of this is again stated to have been done upon the promptings of inventive skill exerted "to meet this specific need." Indeed, as I view its ruling, the appellate court practically placed claim 2 within the categories of the other claims of the patent—to cover in language a pump, but in reality a "combined pump and motor."

When it is recalled that upon the trial of the main issue, notwithstanding the plaintiff's present claim of defendant's multiplicity of infringement, a single structure was brought before the court, the importance of the defendant's contention is manifest. As above suggested, whether the court was right or wrong on the main issues, certain features of the structure then before the court were found to be the bases, not only for upholding the patent upon somewhat narrow grounds, but, being accepted, they resolved the issue of infringement against the defendant. But in the case of the industrial compressors which themselves negative those very facts, the original hearing in dealing with them could have resulted in but one way, viz., that the patent, if to be held valid at all, must be limited as it in fact was—that would have excluded the industrial compressors had they then been before the court, and the issue of infringement respecting those would have been resolved in favor of the defendant. Can the plaintiff now, when the quantum of trespass is the subject of inquiry, demand that these structures, in which the features pressed upon and accepted by the court as indispensable to uphold the patent are absent, should none the less be comprehended? I am satisfied to answer the question in the negative, and defendant's exceptions on this branch of the report must be sustained.

[2] The defendant by proper exceptions challenges the basis upon which interest and depreciation were calculated, pursuant to the master's directions, by the accountants for the parties. Such exceptions do not, of course,

challenge the broad view of the master, that interest and depreciation were and are to be calculated in respect of invested capital and assets representing the same. The master had ruled initially that "Interest on capital actually invested, including, of course, interest on borrowed money, will be allowed as a charge in diminution of profits to the extent of its employment in the infringing operations."

Later, and in disposing of pertinent motions made by the plaintiff, the master adverted to the foregoing, and said:

"The master is not disposed to depart from that ruling. The amount of capital originally invested in the business was $500,-000. * * * Expenditures for buying up claims against the bankrupt National Electric Company, attorney's fees and commissions for effecting the purchase, are not capital invested in the business. Neither is the so-called 'capital profit' shown in the same exhibit capital invested in the business. It represents merely an estimated excess of value of the assets of the bankrupt over the amount of capital actually paid or invested. Plaintiff's second motion is therefore granted and the interest on capital originally invested will be figured on the basis of $500,000.

"Plaintiff's third motion is granted, and interest figured on the so-called 'capital profit' will be included.

"Upon the plaintiff's fourth motion the master is of the opinion that the proper method of figuring depreciation is on cash and not upon estimated inventory valuations. The original cost, as already stated, was $500,000. No depreciation should be allowed on the moneys paid for the purchase of the claims against the bankrupt or upon the other incidental expenses of making such purchases, such as attorney's fees and commissions, nor upon the so-called 'capital profit.' Plaintiff's fourth motion is granted.

"Plaintiff's fifth motion is that in figuring capital invested for the purpose of computing interest, that invested in plant, machinery and light facilities of manufacture only should be included. This would include interest on moneys borrowed and used for the purchase of raw material, or for pay rolls, and also interest on credits extended to customers, in fact, on working capital generally. This is not in accordance with the former decision, and in the opinion of the master is not proper. The plaintiff's fifth motion is therefore denied."

This excerpt discloses the contention between the parties upon what both conceive to have important bearing (in dollars and cents if not otherwise) upon the result. And obviously, if the defendant's exceptions could have no office save that of challenging the master's disposition of a conflict in the evidence, if they could serve merely to move the court to reweigh and recast the evidence so as still to present a conflict, to the end that the court substitute its judgment in resolving the conflict, such exceptions should not avail. But they raise, as I conceive it, purely a question of law in this: That when it was disclosed in the case that the defendant, or some one on its behalf, purchased the assets at a bankrupt sale for $500,000, that *figure* and nothing less should or could be taken as representative of the *capital invested,* or as the value of the assets thus secured, in the ensuing infringing business. And likewise that figure must be, and no other could or should be, used in fixing the appraisal base against which depreciation, waste, or the like, should be cast. Therefore the record discloses that the master, having before him, or at least having a tender of, evidence, all available and pertinent to prove capital invested, limited the situation to cost in cash and denied the legal efficacy of any other proofs such as may commonly be resorted to in determinations of value. That is the effect of the limitation of original cost price as evidence of value. I do not understand that even an infringer is to be denied the right to assert, and if he can, to prove, that he obtained something of great value at a great bargain; or that the defendant here must be denied the right of saying that it bought a million dollars worth of property for $500,-000; and that in ten years ensuing the purchase it had the right—in some situations was in duty bound—to value it at the former figure; or that it in fact was so valued and yielded adequate returns upon that value; or that for the purposes of taxation, and in many other instances, it was obliged to recognize that valuation. And it makes little difference how the excess is characterized—whether capital, profit, appreciation, adjusted value, or simply, value. The subject-matter is property—committed to a certain use—and its value in that use as a representative of invested capital is, at the instance of either party, an issue, so to speak, susceptible of determination upon the ordinary range of proofs. It is not to be gainsaid that the amount paid was a circumstance, but it is not, in a legal sense, the exclusive or the overruling fact relevant or competent to prove value.

Defendant's exception, in my judgment, does not in any sense call for dealing with

mere "paper" values, nor with capital stock, nor watered stock. The defendant, claiming to have capital invested, was entitled to have it admeasured and valued by ascertaining, as it is ascertained in other situations, the value of physical properties embodying or representing capital. True, in a sense and initially the amount paid for properties indicates the capital, in money then parted with by the purchaser and in a sense then "invested." But if upon incorporating such property representing invested capital into a going business, in meeting other obligations, for example, taxes, excises, etc., he may be bound to submit to, or has a right to demand, a higher value upon the "capital" thus invested, or if in the conduct of his business an augmented value is promptly recognized upon his request for credit in borrowing money or in discharging his obligations as a prudent man to insure his property; or if upon offers to sell or upon sales of the property a value greatly in excess of that originally paid by him for the properties would receive unhesitating recognition; if upon a determination to declare an increase of his capital stock such augmented value would likewise be recognized by the authorities regulating stock issues—it seems hard to justify a refusal to treat him in the same manner in a proceeding like this, merely because he is charged with having tortiously committed the property to an invasion of the plaintiff's monopoly on a combined pump and motor. And it seems rather incongruous, if the above considerations are at all tenable, that the recognition above suggested should be entertained as to the noninfringing portion of the defendant's business and assets, but that in some way mere original cost should bind him to an otherwise larger return to the plaintiff because of infringement. The difficulties attending such a course are well illustrated in the record upon the accountants' endeavors to comply with the restrictions placed by the master upon the proofs, both in respect of calculating interest and depreciation. I believe the defendant's exceptions are well assigned and that the account must be recast upon allowing and considering full proof of "value" of property constituting invested capital; and thereby relieving it from the exclusive effect given to the evidence of original cost. I do not wish to be understood as suggesting that defendant's inventory figures are to be taken—in opposition to the master's view—as the sole determiner of value. What is meant, that as against such inventories, and the implied if not expressed proffers to support them by other proof; as against a

ten years' course of assertion (and to some extent recognition, by others) of such inventory figures, the rule that the original cost price, having been paid in money, is the sole determiner of "value" of capital invested, is erroneous.

[3] The contentions with respect to charging taxes and insurance against gross profits arise upon the view enforced by the master, viz.: "This fifth motion is that taxes and insurance be charged against profits as in the reports of defendant's accountants. Upon this motion it appears to the master that taxes and insurance premiums stand upon different ground. Taxes on land, plant, machinery, etc., actually used in the business of the manufacturer, would seem to be a necessary expense and a part of the cost of manufacture, and therefore fall within the rule allowing a charge for interest on capital invested. Insurance premiums on the other hand are wholly optional with the manufacturer and are to protect his property only, and in the event of loss the insurance is payable to the manufacturer, and no part could be collected by the patentee. The master feels, however, that his opinion must yield to the authorities which class insurance premiums and taxes together, and disallow both" —citing cases.

I doubt very much whether the allowance of taxes and insurance is open to question any more than was the allowance of interest when the Circuit Court of Appeals of this circuit, in the Schmertz Wire Glass Co. Case (226 F. 730, 141 C. C. A. 486), reviewed Rubber Co. v. Goodyear, 9 Wall. 788, 19 L. Ed. 566, Mfg. Co. v. Cowing, 105 U. S. 253, 26 L. Ed. 987, and Seabury v. Am Ende, 152 U. S. 561, 14 S. Ct. 683, 38 L. Ed. 553. Indeed, upon the very statement, an allowance for taxes would seem to have justification better than can be urged upon an allowance for interest on invested capital, for the latter in a sense is a return or a gain—an increment or compensation. But taxes, being the most inescapable and preferential of all disbursements because of sovereign exaction, can in no sense be other than a disbursement, money out of hand, laid by the one obligated to pay. It is in no sense a gain, a return, or an advantage retained. Insurance, as suggested by the master, is taken out for protection; but when we test an infringer as one who is liable to account for profits upon the theory that he is a trustee ex maleficio, we are bound at once to look to both the debit and the credit side of trust obligation.

It is my understanding that the popular characterization of an infringer as a trustee

ex maleficio is referable properly to the origin of his liability; that is, his situation is analogous to that of a trustee, but arising through his wrong. He is viewed as one who has profited through wrongful appropriation of a right, and is therefore called upon to account upon the principles applicable to one against whom the liability to account is initially, contractually, or by other express act or assent, created. It was not and is not intended, howsoever adequate the popular characterization of the situation may appear, that the principles of stating the account should be novel, or that they should be applied to produce purely punitive results. The law, after all, aims to cast the infringer's profits as profits are cast. Therefore, in respect of interest, the view has obtained that although capital was used to exploit a right appropriated without leave of a patentee, it was still the infringer's capital, interest whereon is allowable, and quite regardless of whether the infringer actually paid it as upon borrowing.

Now, upon the modern view, a trustee who fails to insure trust property is guilty of negligence, and he may be called upon to respond for the damages so occasioned by such want of prudence; which, of course, means that, being a trustee, he must take cognizance of the universality of insuring property by men in the careful conduct of their affairs. So, it would be anomalous to withhold from an infringer, merely because his liability is said to be analogous to that of a trustee ex maleficio, credits for disbursements which, had he been a rightful trustee, would have been unhesitatingly given him because the law demands that he incur them as a matter of duty. And as indicated, the doctrine of account as upon a trust certainly cannot be introduced merely to punish the wrongdoer by treating as gains actual disbursements which, had the trust been lawfully created, would be recognized. So, when interest on invested capital is recognized, there cannot be a shadow of principle upon which to withhold allowance for taxes and insurance.

[4] An important exception is directed against the finding of the master upon the so-called repair parts item; and if it involved merely an inquiry respecting the scope of the doctrine of contributory infringement, much less difficulty would attend. Upon argument, and likewise in the briefs, the parties are not in discord upon the terms of the general principle. The plaintiff's argument is attacked because upon the record, so it is said, a purely conjectural element or step must be introduced to reach a conclusion. There is a finding of something like $67,000 as profits made upon the manufacture and sale of repair parts. It is argued on behalf of the plaintiff that when the making and sale of a large number of perfected devices— infringing devices—is established, and it further appears that during the infringing period large quantities of parts which are not only duplications of parts of the perfected devices thus sold, but which were in truth sold for the purpose of repair, replacement, or retention as duplicates for emergencies, it is the duty of the court to treat such manufacture and sale of such parts, though not of themselves infringements, as contributions either to (1) the original infringing act of making and selling the completed device, or (2) as contributions to an infringing use (by some one) which must be assumed to have ensued the original infringing act of making and selling.

Upon defendant's motion that repairs be eliminated from the account, the master observed: "It is res adjudicata in this case that defendant is an infringer by the manufacture and sale of compressors covered by plaintiff Christensen's patent. It is conceded in defendant's account filed with the master that it manufactured and sold repair, renewal, and replacement parts for such infringing compressors. Counsel for defendant claim, however, if the master correctly understands their argument, that the manufacture and sale of such repair parts to users of the infringing compressors bought from defendant constitutes merely a contributory infringement, and before it can be compelled to account for profits and damages on such manufacture and sale, the infringement by use on the part of the purchaser must be judicially determined; but this cannot be done until the case at bar is finally decided, and that thereafter the users cannot be proceeded against under the well established rule that the use of the compressors will have been compensated by the decree in the case at bar awarding profits and damages for the infringement by manufacture and sale of the compressors, citing Stebler v. Riverside, 214 F. 550, 131 C. C. A. 96, L. R. A. 1915F, 1101. If this be true, the plaintiffs are in an unfortunate position. Defendant's account shows that the greater part of its profits were derived from the manufacture and sale of repair parts. To protect against subsequent liability for infringement, it would seem that the decree in the case at bar should cover all profits and damages, those derived from the manufac-

ture and sale of repair parts as well as those derived from the manufacture and sale of the complete compressors."

After citing cases, the master continued: "Had others manufactured and sold repair parts to the defendant company which has been adjudged to be a trespasser, such others would under the foregoing rule be equally liable as parties to the trespass. Can it be that defendant can escape liability merely because he manufactured and sold both compressors and repair parts? This does not seem reasonable. If the manufacture and sale of repair parts is to be construed as a contributory infringement, *then it must be contributory to the original trespass in the making and selling the infringing compressors.* (Italics supplied.) Certainly the manufacture and sale of repair parts constitutes a trespass and must be accounted for. Defendants accountants have designated the repair parts for the various infringing compressors sold. If they were not sold to be used and in fact were not used on such infringing compressors, that can be shown by defendant. In the absence of such a showing on the part of the defendant the master must assume that they were sold and used on the compressors for which they were designed. The defendant's seventh motion is denied."

As above intimated, the parties agree that the doctrine of contributory infringement in patent causes exhibits none other than the elementary principles of the law of torts applicable to joint wrongdoing. In other words, the contribution in the eyes of the law must be tortious. Therefore, when one contributes to an act of manufacture, sale, or use which latter is or are infringing, his liability as a joint tort-feasor or trespasser, that is, as a contributory infringer, may depend upon a variety of circumstances and, in any event, may arise as easily and as frequently as do other acts of contribution to wrongdoing. I assume that if a coal dealer sells coal to a manufacturer who is making infringing devices, he will not ordinarily be held to be a joint or contributing infringer. So, too, of a seller of pig iron used for castings, or a seller of stock articles, if such there be, as piston rings, oil cups, bolts, etc. But in any of these cases, once it be shown that the seller expressly and affirmatively agreed to sell with knowledge of the infringing act and with a purpose to further its accomplishment, a contrary conclusion can be reached. So, too, if the seller or contributor do that which is indispensable to the accomplishment of the object and which need not, in fact

could not, be done, except to accomplish the object, and which could not ordinarily subserve any other purpose, his liability may be predicated upon the mere doing of the act howsoever innocent and blameless he may be of any conscious design to aid infringement. In this situation of the law, manifestly, the varieties of contributory infringement may be as numerous as contributions to other trespassers. But this must be true: That the contribution must be toward the commission of an act of trespass which for the purpose of a remedy can be assigned to a category. Wherefore, in the patent law the contribution must be to an infringing act such as is cognizable, namely, making, selling, or using without leave of the patentee. It is as essential to prove one or the other of these as it is to prove the fact of an assault before one can be held to be a contributor, aider, or abettor thereto. So, when a charge of infringement is lodged, it necessitates proving that the device which was made, sold, or used was in fact an infringing device and there must be added thereto proof of the fact that the defendant made or sold or used; and likewise in applying the doctrine of contributory infringement, it is essential to prove that the defendant, if he did none of these, contributed to the making, selling, or using of the device, in fact made, sold, or used, by some one else. Necessarily, when the quantum of the trespass is the subject of inquiry to the end that compensation for violation of the patentee's rights may be thereby admeasured, it becomes essential to prove the quantum of making, selling, or using.

Recurring now to the view expressed by the master, it seems impossible to say, when the infringing acts of manufacture and sale of completed devices are shown, that thereafter the manufacture and sale of a repair, replacement, or duplicate part of the devices can be contributory to the initial completed infringing act or acts. So far as the manufacturer and seller is concerned, any further act of his must be incidental or contributory to infringing resales or to infringing uses. As suggested above, it may be put in another way: Contributory infringement certainly implies infringement as a resultant of contribution by more than one person. Therefore a *manufacturer or seller who infringes* by manufacturing and selling cannot be both infringer and contributory infringer respecting his own single act of making and selling. When, however, he subsequently makes or sells, not the patented device, but some part thereof, his act, if it can be challenged

at all, must be shown to be in some relationship to the structure which has passed from him, and that relationship, in point of law, must appear to be a contribution to a then subsisting infringement. In this state of the case, the question recurs whether the finding of the master of a large sum for profits on the making and sale of repair parts can be sustained upon proof in the record adequate to show defendant's contributory infringement in a true sense. Certainly, if the defendant were shown merely to have manufactured, and had on hand a large quantity of repair or replacement parts, an injunction would not go against it upon the theory that such manufacture was per se an infringing act. The injunction would have to be predicated upon proof and by its terms limited to a showing of an intention and purpose to sell or dispose of by way of contributing to other existing or impending infringements. Does the fact—admitted —that the defendant made and sold such parts, furnish a sufficient basis for inferring that it thereby profited upon its contribution toward subsisting infringements by users or resellers? In other words, is the admission that repair parts which were sold had been manufactured for use upon completed structures theretofore sold—in case repairs or replacements were needed—make out a complete case of infringement of the patentee's rights to which infringement the defendant was a contributor? As indicated heretofore, this involves the assumption, which may be plausibly entertained, that an infringing sale very likely passes into either an infringing use or the possibility of an infringing resale. These questions impress me as of very narrow scope, but their importance arises out of the large award that has been made, and, fundamentally, out of the fact that liability for contributory infringement is sought to be predicated upon presuming the infringement or infringements toward which the contribution by the defendant was made. I assume that the suggestion by plaintiff's counsel respecting the difficulty of proof can afford no ground for relieving the plaintiff of the ordinary burden of prima facie proof.

By way of illustration, let it be supposed that B. is manufacturing and selling combined pumps and motors covered by A.'s patent. Three of the devices are sold to C., D., and E. Plainly, A. can recover from B. the profits and damages arising upon such infringement. Let it be supposed that B. also sold to F. repair, replacement, or duplicate parts of the structure covered by A.'s patent, and that a profit was realized upon such manufacture and sale. Without further proof, can A. recover from B. the latter profit? Will it be presumed that (1) the devices sold to C., D., and E. went into infringing use; (2) that the repair parts sold to F. were intended to contribute, and (3) in fact contributed to such infringing use; or must the infringer be held to account without any presumption or proof but upon some theory of estoppel to deny both the infringement and his own contribution thereto? In this illustrative case it may be difficult for A. to adduce the proofs if these presumptions or estoppels are not indulged, but equally so may it be difficult for the manufacturer to adduce them, neither of which, however, in my judgment, justifies the elimination of proof of infringement in fact and contribution thereto in fact. It would strike from the law of contributory infringement its fundamental ingredients, expressly found in its statement, namely, participation and profit arising out of a wrongful act. It may be interesting to press the illustrative situation above a little farther by assuming that either the patentee or the infringing manufacturer was able to show that F., who bought the repair parts, was a jobber, and at the time of the hearing still had all the parts on hand. Manifestly, the patentee would have to assert that although there had been no infringing contribution in fact—that is, the manufacture and sale of parts had not as yet contributed to any infringing use—yet the manufacturer made a profit out of the partial execution of his intention that such parts might ultimately contribute to a future infringing use. And, of course, as indicated, this eliminates from the case as one of contributory infringement, the necessity of showing any subsisting infringement. In my judgment, the same incongruity would arise if it appeared that the manufacturer had not sold any of the completed devices, but had sold quantities of repair and replacement parts. I appreciate the extremity of these illustrations, but they are suggested upon a judgment which finds infringement in manufacturing and selling the patented structure, and whereunder is developed this claim of contributory infringement.

I have no doubt that in the large record upon which this report is based, there is much indicating the use of the compressors sold by the defendant, but I cannot believe that the plaintiff ever sought to establish infringing uses coextensive with the defendant's initial infringing manufacture and sale, or that the repair parts reported on were dealt with as

contributions to proven infringing uses. Indeed, the master's report most persuasively shows that once the item "repair parts" was made up out of the defendant's books, the liability of the defendant as contributory infringer was thereby fixed solely with reference to its original infringing act of making and selling. I have indicated that this is considered an erroneous view; that it holds the defendant upon profits which are not shown to have been made upon contribution to an infringing act or acts which appear other than upon assumption or presumption. In this state of the record, I feel impelled to sustain the defendant's exceptions to this item, but, upon remission of the case to the master, with leave to the plaintiff to supply any additional proofs pertinently supportive of the issue of, infringement in fact to which the defendant made contribution. And this branch of the case is further left with express reservation for future consideration of the question pressed by the defendant, whether under the decree a recovery for damages or profits upon contributory infringement is at all possible. An additional consideration for making this nonfinal disposition of the matter is my view upon the plaintiff's exceptions to the master's failure to make a finding on damages. Plainly, if this issue is determinable by the master, as I believe it is, it may comprehend an item or items, directly or indirectly based upon infringing resales or infringing uses. That is, no matter what bases may be resorted to for admeasurement of the damages, it may either approach or entirely comprehend a field overlapping profits. In any event, it will necessitate establishing to a fair certainty the degree of infringing use or the degree to which otherwise the field of monopoly belonging to the plaintiff has been invaded to his damage. The parties seem to agree that when once a judgment which embodies full compensation to a patentee has been awarded, the devices sold by the infringing manufacturer are thereby exempted in the hands of the user; and the defendant herein raises the serious question whether such exemption does not operate from the time of sale. Plainly, the defendant is vitally interested, in any event, in having the fact of its own direct and its indirect infringements established. And it would not be denied that, for example, if the damage were to include anything beyond the mere fact of manufacture and sale, the infringements, the consequences beyond those facts which produce the damage, must appear. If, for example, a royalty basis of

10 F.(2d)—55

$5 per device were asserted as adequate to prove the value of the wrongful appropriation both by the defendant and those who during the infringing period were the recipients of not only the original invasion by the defendant, but its subsequent contributions, the entire facts of sale and use would have to be shown. The fact and the degree of use may be an important ingredient in estimating damage.

[5] The master reports that damage was shown, could be found, but is not found because of the master's views that his award of profits, if satisfied, would be adequate compensation for the entire invasion of the patentee's rights. Concededly the latter is not entitled to duplication, but as the parties agree, he is entitled to make a choice, and it is not the province of the court to make it for the patentee.

[6] Upon the question raised by the defendant respecting the treatment of patterns and drawings, I feel that the master's disposition thereof involved the determination of a matter of fact. Whether patterns and drawings should be dealt with solely as items of expense, or whether they should be valued as a part of assets, does not, so it seems to me, raise purely a question of law. The record discloses a long period of time in which patterns and drawings for the manufacture of the infringing devices were developed and retained but not accounted for on the books of the defendant as physical assets carrying an inventory valuation. The latter circumstance cannot, of course, determine whether they fall within one or the other category. Beyond the testimony in this particular case, it is a matter of common knowledge that variant views are entertained by manufacturers upon this matter, and therefore, so it seems to me, the master had a right to proceed to its determination as a question of fact. And when he decided that he would treat patterns and drawings as assets subject to valuation, the conflict as to the manner of valuing, whether he pay greater or less heed to their current non-productivity, or to possible or probable obsolescence, or whether he deal with them as potentially valuable and somewhat indispensable, was likewise for him to determine. So that the entire situation afforded opportunity for placing a figure upon a somewhat arbitral basis. Concededly, patterns and drawings could be found to have some value. Their mere retention as instrumentalities in maintaining ability to manufacture seems to me conclusive, and the finding is not open to attack.

[7] Some contention arises over an alleged necessity of segregating profits made upon the infringing structure, the defendant claiming that in part they were attributable to its "improvements." Speaking broadly, I assume that when an infringer claims to have "improved" the patented structure, so long as he is still within the inhibited field of the patent—either as a whole or respecting any mechanical element or part of the structure—he is still infringing. If by such "improvements" he really betters, even beyond the contemplation of the patentee, but does not make a new or different structure in a legal sense; if he thereby promotes, no matter in how high a degree, its mechanical or commercial favor; if he thereby increases the gains and profits on an individual sale, or decreases them, but because of its greater favor with the public, increases production and thereby aggregate profits—he is still exercising the patentee's rights. He is accountable for the profit whether his infringement embody the most, or the least, favored of possible variant structures. Thus, let it be assumed that an infringer, in building the plaintiff's combined pump and motor, introduce the most desirable form of piston ring covered by the infringer's own patent, he may be able to show the undesirability, as a practical matter, of any other form of piston ring, indeed that it was a strong inducing factor to promote the mechanical and commercial favor of the structure. Yet that was simply a means of promoting the infringement. His profit was none the less an infringing profit, and the law will not permit him to say that he in truth sold his piston ring, but did not sell the combined pump and motor less the piston ring, at a profit. In other words, his liability is not dependent upon his having been lavish or niggardly in the accoutrements of the infringing device, or in the degree of its perfection within the scope of the patent. Such a situation, as I conceive it, never presents an issue of segregation in its true sense. Some of the "improvements" claimed by the defendant were clearly to be rejected upon these general considerations. It is my judgment, upon the evidence, that at no time was there presented to the master a situation clearly requiring a determination of any issue of segregation of profits.

[8] I make these observations quite regardless of any rule of burden of proof, in view of the wealth of evidence to establish the manufacture and sale by the defendant of a unitary structure—a combined pump and motor—embodying the plaintiff's patent. But so far as it is necessary to determine any question of burden, I have no hesitation in agreeing with the master that if a situation was disclosed which called for segregation, the defendant disclosed it and should carry the burden of making the segregation, if possible, because its claim, if at all tenable, arises out of its disclosure that it commingled other elements with the elements of plaintiff's combination.

That is to say, when once it is shown that the infringer sold a structure having the unitary characteristics of a patented structure, and that a profit was realized on such sale, the patentee ought to have the right to treat that as a sufficient prima facie showing of the measure of his recovery; and if the infringer, though conceding the prima facie profit, desires to mitigate the recovery by showing attribution of the profit or a part thereof to something else, the latter showing should be considered as a defensive burden resting on the infringer. With respect to the evidence in the record, which is claimed to bear upon this matter of actual segregation, it seems to me that neither of the parties tendered to the master anything of real probative value. The testimony of the patentee that the entire value of the infringing structures rested in their embodiment of his patent; the testimony of defendant's witnesses that the infringing structures had only 10 per cent. of value attributable to the plaintiff's patent, could not possibly aid the master in making what the law calls a rational segregation, if it is to be made. Such testimony amounts to little more than an attempt on the part of the witness to decide an issue. I am satisfied to overrule the exceptions directed against this phase of the report.

With respect to the finding upon charging factory overhead on betterment labor, the contentions of the defendant seem at most to challenge the degree to which the master failed to accept either a theory of, or the degree to which he failed to accept an apportionment suggested by, one of defendant's accountants. In this situation, the court should not be called upon to make its own apportionment, if upon any view of the record the master was justified in accepting either a variant theory of apportionment, or in making a variant apportionment upon an accepted theory. The briefs filed by the parties disclose the conflict in the record which would justify the acceptance either of a variant theory of, or an actually variant, apportionment. The exceptions directed to this

phase of the report will therefore be overruled.

I am reserving decision upon the defendant's exceptions to the report on sales 'at a loss with the hope that upon further argument it may appear to me with greater clarity than its consideration thus far has produced. The contentions are so variant both as to the rule or rules governing the determination of sales at a loss, and neither side seems willing to concede the other's contention respecting what the master and the accountants actually did in applying any rule or rules, that I have determined to reserve it, as just indicated. Whether the matter is entitled to the disposition herein made of the items, patterns, factory overhead, etc., that is, whether anything more than a similar conflict is presented to the court, whether there has been a departure 'from some radical rule of law by the master is not determinable upon the presentation of the case in the briefs, because the parties seem to disagree fundamentally as to what the accountants and what the master did. This branch of the case is therefore left with the suggestion that if the parties so desire, the court will hear further argument at any time.

As has been intimated, the exception taken by the plaintiff to the failure of the master to award damages will be sustained. I think this is necessitated by the attitude of the master as disclosed in the record. The plaintiff certainly had and has a right to have its claim for damages adjudicated one way or another upon this accounting. The master clearly intimates, not only that the plaintiff was entitled to damages, but that upon the evidence the amount thereof could be ascertained. Now, the grounds assigned by the master are consistent with the idea that the damages may be less, equal to, or greater than, the aggregate profits. Clearly, if less than or equal to the profits, it may be assumed that the failure to award them could not aggrieve the plaintiff, but the future of the accounting on profits may produce a result upon which the master himself might not want to adhere to the ground assigned for failing to proceed with the award of damages. The long pendency of this litigation perhaps justifies the observation that so important a question respecting the right to have damages and their admeasurement should not be left open either in point of law or of fact, either before the master or before the trial court. These reasons strike me as ample for sustaining the exception, without passing upon the ultimate question of the right to damages, the principles of their admeasurement, or their amount, upon the evidence in this case.

An order may be entered sustaining, overruling, or disposing of the particular exceptions as herein indicated. All other exceptions are overruled.

### Supplemental Opinion.

Pursuant to a suggestion in the former opinion herein, the parties have reargued the exceptions to the master's report on "sales made at a loss." Full recognition is given by counsel to the broad general doctrines (1) that an infringer must account for the profit made by him on each infringing act; and (2) that, in calculating such profit, allowance cannot be made for losses sustained; and the case here deals, not with disputation over these principles, nor their general applicability, but rather with methods justifiably to be pursued in ascertainment of the fact of profit or of loss in respect of an individual unit of manufacture or sale.

[9] The contentions will be considered in the light of observations made in the former opinion, viz. that, after all, the principles governing an accounting against an infringer or a "trustee ex maleficio" are the principles which govern trusts in their lawful management, and, when dealing with manufacturing or selling, those principles which are normally and justly cognizable as guides in determining the fact of profit or of loss. In other words, in a given situation, legally, there cannot be *two* equally tenable theories or hypotheses—one producing profit, the other loss, upon respective application—with the *right in patentee* to select the one giving him, directly or indirectly, the larger return, or, conversely, subjecting the infringer to the larger liability. I do not mean that there may not be an election between *profit* and *damage*. What is meant is that the patentee optionally cannot fail or refuse to recognize the conduct of the infringer, *as it may accord with what is recognized* in *non*infringing situations, to establish "infringing" profit as something greater, other, or different from "profit" in its legal and just signification. He is bound to recognize that the infringer, trying to confess and to substantiate a profit, trifling on each unit, .but large in the aggregate, is responding to the right, and no other, which the law grants to enforce against the infringer the liability *as for a profit made*.

Equally true is it that the infringer has no countervailing right or option. Neither can select methods of calculation, thereby to cast infringing units into or out of the realm of profit or of loss, with the ulterior motive thereby to augment or to mitigate real profit or real loss, or liability for damage, or otherwise. The method of ascertainment must be single and enforceable against each.

The illustrative examples about to be given do not profess to reflect the testimony herein as it bears upon the exceptions under consideration; but they embody the assumptions and the divergent claims respectively made, and, as they were in substance used upon oral argument, by incorporating them here they may conduce to greater clarity in an opinion whose subject-matter, in any event, invites extended discussion.

(1) If a manufacturer with a factory of large capacity undertakes to make and sell 100,000 articles, under a single or several contracts, he may develop this result:

| Number. | Direct Cost Labor and Material. | Overhead. | Selling Price. | Profit. |
|---|---|---|---|---|
| 100,000 | $40,000 | $20,000 | $80,000 | $20,000 |

In this example there is the fundamental assumption, recognized by the parties and all accounting experts, that the item "direct cost—labor and material," as to each unit manufactured, is, at least usually, definitely calculable. That is probably why the adjective "direct" is imported. Now, if the statement in this simple form has no object other than determining aggregate results, the *profit* is clearly $20,000. It makes no difference whether the "direct" expense be definitely calculable, or whether the indirect burdens be definitely or ratably calculated or calculable against the unit. The totals of numbers made, of direct labor cost, of general burden, and a total selling price, which latter, however, has been *uniform* as to each unit,

are all the elements presented with a view of ascertaining a *total profit*.

But let the example be amplified thus: That the manufacture and sale of the 100,000 articles be undertaken in ten successive contracts at successive periods of approximately two months in the course of a year, for different quantities under each contract, for the same or for different prices per unit, at the same direct labor and material cost per unit, but necessarily without incurring as to each unit *any* definite (or, in any event, rationally calculable proportion, per unit) item of general or indirect burden, which latter may have remained the same, or, if increased, by a relatively small *rate per unit*. Upon this amplification, what answer must be given to the contention that the general or indirect burdens—overhead—must be spread ratably to *each* unit manufactured, regardless both of the *price* at which it was sold and of the fact that such unit did not in reality receive such ratable allocation as an indispensable item of cost in *its* manufacture? Therefore, if the manufacturer, proceeding with the execution of his engagement as above stated in its simplest form, is offered opportunity to engage in greatly increased effort, but at greatly reduced prices, is confronted with a proposition for 1,000,000 more units at a price of 41½ cents each, instead of 80 cents, upon his first contract. (2) If, for example, we assume identity of direct labor and material costs per unit, if we assume an additional general or indirect burden of $5,000, and also disregard any attempted allocation of the previously assumed, *and incurred* general burdens, his venture nominally may be thus projected:

| Number to be Made. | Direct Labor and Material Cost. | Additional Burden. | Selling. | Profit. |
|---|---|---|---|---|
| 1,000,000 | $400,000 | $5,000 | $415,000 | $10,000 |

And the two ventures would add up:

| Number. | Direct Labor and Material. | Additional Burden. | Selling Price. | Profit. |
|---|---|---|---|---|
| 100,000 | $40,000.00 | $20,000.00 | $80,000.00 | $20,000.00 |
| 1,000,000 | $400,000.00 | $5,000.00 | $415,000.00 | $10,000.00 |
| 1,100,000 | $440,000.00 | $25,000.00 | $495,000.00 | $30,000.00 |

At this point the plaintiff's contention in the present case may be stated in substance: That each unit of manufacture must be dealt with as a separate infringing act; that it must stand *its* share of the cost to the end

that *its share* of the profit may be awarded. Wherefore the general or indirect burdens must be allocated to each unit; in the case before us $1/1,000,000$th, which concretely would amount to 2³⁄₁₁ cents, as an item of

cost. In the examples above, $1/11$ of the overhead would be allocated to the units comprised in the first $10/11$ to the second, and upon extension the results are:

| | Number. | Direct Burden. | Indirect Burden Allocated. | | Profit. | Selling Price. |
|---|---|---|---|---|---|---|
| First example | 100,000 | 40,000 plus | $1/11$ $25,000 (total burden) | 2,272.73 plus | 37,727.27 | $80,000.00 |
| Second example | 1,000,000 | 400,000 plus | $10/11$ $25,000 (total burden) | 22,727.27 minus | 7,727.27 (loss) | 415,000.00 |
| | 1,100,000 | 440,000 | | 25,000.00 plus | 30,000.00 | 495,000.00 |

Looking merely at results thus accomplished in the limited compass of these two examples, it appears that, without the advent of the second example, a conceded profit of $20,000 would measure the patentee's recovery; but with that introduced, as exhibiting a ten fold aggravation of the quantum of infringement, the patentee is permitted by this process of showing *that* to be at a loss, to enrich himself $7,727.27 beyond the $30,000 at least nominally saved by the infringer as *his profit* on both, but *$17,727.27,* beyond the profit which would have accrued if the second venture had never been undertaken. In other words, the "losing" venture *nearly doubled the profits.*

In the examples above, an assumed small additional overhead is attributed directly to the ventures under the lower priced contracts. In a simpler situation, example 3, immateriality of this in its effect on the working out of the plaintiff's theory is manifest. A manufacturer engages to build and sell a single machine upon the terms, cost burden and the like, about to be stated. It may be assumed that the contract is worth the while upon prospect of a year's time and upon, approximately, the total general or indirect burdens noted. Upon substantially general burdens already incurred, he builds a second machine, but sells it at a far lower price:

made under, the second without, license. Upon establishment of infringement, could the infringer, in the accounting for *profits,* respond that upon exact allocation of the $200,000 general burden, $100,000 to each machine, no profit was made in the second or infringing transaction? Could the patentee, not content with recovery of *profit,* but seeking recovery for highly damaging infringement to him, though unprofitable to the infringer, pursue the latter and endeavor to establish damage through loss of gains which would and should approach those made by the infringer on the *first machine, which he would assert* were $400,000? It is not intended that this necessarily presents a correct rule for admeasuring damages. But if a patentee cannot receive both profits and damages, if the latter include, as they frequently may, elements entering into gains or profits actually made; if recovery of reasonable royalty as damage measure may rest, in part, upon profit actually made—it is easily to be seen how either patentee or infringer, by excluding the possibility of profit or damage respectively, may maneuver himself into more favorable pecuniary position.

The foregoing considerations are believed to demonstrate the true character of the method sought to be applied by the plaintiff, for some purpose, in casting the recoverable profits in this case. Manifestly, when the master directed the preparation of the account by allocating to each unit its equal

Example 3.

| | Direct Cost. | General Burden, etc. | Sales Price. | Profit. |
|---|---|---|---|---|
| First Machine. | $ 500,000 | $200,000 | $1,000,000 | $300,000 |
| Second Machine. | 500,000 | | 600,000 | 100,000 |
| | $1,000,000 | $200,000 | $1,600,000 | $400,000 |

Noting totals only, the manufacturer plainly made $400,000 *profit.* Suppose, now, a question of infringement arose; a patentee claiming that of the two machines (identical in every respect) the first was share of overhead or general burdens, the divergence between eminent accountants respecting its propriety, possibly from an accounting standpoint, or its justice in the light of facts, became immaterial. When the

mass of items bearing upon direct costs, overhead, general burdens, selling prices, no matter what the classification, had been assembled and directions given to allot to each unit a definite rate of overhead, *whether or not it was incurred in fact by the unit,* accountants were bound to say that some result, either of profit or loss, upon each unit *as created by that method,* was possible and in fact achieved—certainly on paper. And accountants who, notwithstanding the directions, challenged the method, then voiced merely the present complaint of the defendant—not against the correctness of the results arithmetically, but against the tenability of the method in a legal sense, in the light of the facts as they believed them to exist. I do not conceive that defendant's exceptions deal with a conclusion resting upon a conflict of evidence, but rather with a rule invoked and applied to throttle evidence, which, probatively, would effectuate an entirely different result.

In analyzing the doctrine contended for, it would seem that when actual profit *per unit* is sought, there must be a purpose to exclude both *aggregate* and *average* profit; for the "method" in its simplest form reflects (1) recognition of the factor "direct labor," etc., as not only constant, but also *real,* per unit; (2) the averaging or allocating of overhead which, ordinarily, is not, cannot, and *is not intended to be constant, per unit;* (3) selling prices in their exact terms. As has been observed, the terminology used—e. g., "direct labor and material costs"—expresses calculability and calculation according to the facts in a unit of manufacture. Overhead, "general," burdens, inherently exclude the idea of allocation or attribution of cost items in exact accord with actual unit disbursement. Indeed, "averaging," of necessity, is conditioned upon aggregation, usually, of elements of varying quantity or quality, and therefore, when calculated, as to the unit, it may be called an imposed or imputed result, which disregards real differences. If a dozen articles cost $3, each actually *may* have cost 25 cents as the price paid; if the cost of each vary but aggregate $3, the several units then have not an *actual,* but an *average* cost of 25 cents. If, upon the first assumption, each is resold for 50 cents, an actual profit of 25 cents is earned by the unit; but if sold at varying prices, aggregating $6, some may have been sold at a loss, though at an *average* profit of 25 cents. But the actual aggregate profit is $3.

In these simple cases, involving nothing other than setting over unit or aggregate costs against unit or aggregate selling prices respectively, the result is entirely clear; for, respecting the units, there are but two elements, conceded direct costs and sales prices. But, upon introducing intermediately the original purchase cost and the selling price, a burden not accruing to, not intended for, and usually incapable of, application to units, *ratably,* the accounting and the legal aspect is changed, whether dealing with manufacturing or selling, or both. Burdens, like taxes, general salaries, do not increase ratably with increased manufacturing or selling. Their minimum, regardless of volume, is frequently capable of fairly accurate estimate or projection. And when such burdens have not only been safely projected in advance, or when they have been actually incurred, nothing is more common than to enter upon what is known as "quantity" manufacture or selling, in view of the *capacity* of incurred or accrued overhead, without substantial increment to carry it on at reduced selling prices. In other words, to make "profit" by "making overhead" is a common expedient. Basically, its justification is found in the very thing which the method employed by the plaintiff ignores, viz. the *continuity* of the acts of manufacturing and selling and the availability of general burdens to encompass increasing volume at decreasing selling prices. It might be stated broadly as recognition of a descending ratio of general burdens—per unit—in increasing volumes of production or selling, or a descending or diminishing rate of return per unit upon increased volume.

If this be a fact, unhesitatingly cognizable, then the circumstance that the manufacturer or seller happens to be an infringer, cannot destroy its significance. If, as an infringer, he may be subjected to allocation of overhead which he never laid out—per unit—except in an "average" sense, why should he not with equal right set up an allocated selling price which he never received, *per unit,* except in a like "average" sense? Applying this query to example 3 above given, certainly "allocation" of $100,000 overhead is just as meaningless and fictitious as is an "allocated" selling price of $800,000 per machine. Neither speaks the realities developed in making or in selling the machine. True, if everything—units, their entire cost, their selling price—be first totaled and then averaged, the total number of units being the divisor, an *average* which may be an actual labor and material cost, a real *average* overhead, a real *average* selling price, and a real *average* profit or loss will be reflected. But

it by no means demonstrates any *share* of profit of a unit in the sense of reflecting the difference between the actual cost and the selling price of a unit. And the result is not any other or clearer as a reflection of that sort of a share when one only of two variables—overhead, etc., and selling prices—is averaged.

Therefore, giving full recognition to the patentee's right to recover all profits, it is none the less necessary to deny to him the right to remake or to resell the units on a hypothetical or fictitious basis. By this is not meant that any unit or units are to be considered more or less infringing because of the *manner* in which they were made and sold. What is meant is that the normal characteristic or tendency of overhead or indirect burdens in progressing or receding, other than in an exact ratio to the unit of manufacture or sale, cannot be supplanted by ratable allocation, repugnant to the fact of this characteristic or tendency, where it is shown to exist. That characteristic or tendency is just as much a fact to be reckoned with in accounting, and therefore in law, as are other facts pertinent in determining costs. And it is not only pertinent, but it must be dominantly so, whenever the infringing acts exhibit continuity of a normal sort in manufacturing or selling. As a *determiner of prices*, high or low, in a continuous course, its influence upon a prudent manufacturer and seller cannot at one time have just recognition, and at the same time be ignored, in order, by unit allocation, to condemn *as unprofitable* the prices established, notwithstanding large aggregate actual profits.

It is difficult to see why quantity manufacturing and selling at prices which are effective to cover direct costs and to *recover,* as it may be termed, overhead incurred in any event on *less* quantity, must be regarded as unprofitable, either in the aggregate or *per unit.* The test for determining profit or loss by merely casting the sum of direct costs plus an allocated portion of selling, indirect or general burdens, against a selling price cannot be recognized in determining actual profit in either an *infringing* or a *noninfringing* situation. Averaging or allocating, for cost-estimating purposes, and calculation of profits received, are different. One may have as its objective prices to be asked; the other must respect prices exacted and received.

[10] Upon this discussion we are convinced that, when the ordinary course of manufacturing or selling is continuous, having constant factors of direct costs, variable factors of overhead and selling prices, the continuity of the process, and the unequal alliance of the constant and variable factors, at once destroy the possibility of casting an actual, as distinguished from an average, profit per unit. The importance of the matter in this case is at least twofold, in that the method invoked may impose upon the defendant either an aggregate, or a so-called per unit, profit, which is greater or different than that actually received; and, secondly, in setting out infringing units beyond the field of profits, to be dealt with perhaps somewhat mandatorily as a basis for awarding damages. And upon examination of the accountants' application of this rule to a great number of instances, where sales prices and direct costs would seem at once to suggest profit, but which are figured out, by allocation, to have been at a loss, the importance noted is made concretely, just as the examples herein given make it hypothetically, manifest.

Now, it is not intended that just because there is continuity there must in each case be an award of aggregate profits on the continuous process—that there can be no such thing as 'a sale at a loss—per unit or otherwise. There may be clear or border line cases of loss. If selling prices fail to meet the labor and material cost, it would seem quite impossible to declare "profit" in any form. But, if in a continuous process, declining selling prices are fixed in recognition of the power of previous higher selling prices to meet these indirect burdens, wherefore the lower price is acceptable because it meets direct costs and above that produces lower profit, or· recovers, reclaims, or "makes" overhead, already met, such course should be held profitable in law as it is regarded in fact. It is but repetition to say that the "method" invoked by plaintiff of conditioning every unit with an allocated and equal portion of these burdens, to make out a "loss," whenever the selling price per unit falls below the direct cost plus such allocation, is arbitrary and fictitious; that there is no such thing as "infringing" profits or losses, in contradistinction to real profits or losses. When this conclusion is reached, the defendant's exceptions on this branch of the case must be sustained, for they seek to test the tenability of the method. It leaves the case for ascertainment of profits—actually made and received—"as a manufacturer or seller casts his profits."

An order may be entered, sustaining the several exceptions pertinent to this branch of the case.