ADMIRAL CORPORATION,
Plaintiff,

v.

PRICE VACUUM STORES, Inc., et al.,
Defendants.

Civ. A. No. 14127.

United States District Court
E. D. Pennsylvania.

May 25, 1956.

As Amended June 22, 1956.

Wilkinson, Huxley, Byron & Hume, by Gerrit P. Groen, Chicago, Ill., Montgomery, McCracken, Walker & Rhoads, by Joseph W. Swain, Jr., and Walter H. Bartholomew, Jr., Philadelphia, Pa., for plaintiff.

Caesar & Rivise, by A. D. Caesar, and Max R. Millman, Philadelphia, Pa., for Morton Q. Klein, trustee in Bankruptcy and Price Vacuum Stores, Inc.

Leonard L. Creskoff, Philadelphia, Pa., for the trustee.

798

Charles V. Linshaw, Philadelphia, Pa., for Jack and Dorothy Price.

Isadore H. Schwartz, Philadelphia, Pa., pro se.

GRIM, District Judge.

Plaintiff, Admiral Corporation, has brought this action against Price Vacuum Stores, Inc., five of its wholly-owned subsidiaries,[1] its President and Treasurer, Jack Price, its Vice President, Dorothy Price,[2] and its Secretary, Isadore H. Schwartz.[3] The action was brought August 22, 1952, for an injunction and for damages. The complaint charges defendants with infringement of plaintiff's registered trade-mark "Admiral" and unfair competition, by selling electric vacuum cleaners and sewing machines under the name "Admiral" from September 1, 1949, to August 31, 1952.

On September 2, 1952, I entered a temporary restraining order and on September 9, 1952, a temporary injunction restraining the use of the trade-mark "Admiral" in the distribution and sale of household equipment and appliances such as electric sewing machines and vacuum cleaners, and other infringement of plaintiff's registered trade-mark.

On November 8, 1954, the corporate defendants were adjudicated bankrupts.

The case has been tried before me without a jury.

This plaintiff on October 22, 1951, began a similar action against another of the subsidiaries of defendant Price Vacuum Stores, Inc., in the Western District of New York. In that action the plaintiff was granted a permanent injunction on August 8, 1952, restraining the defendant from competing unfairly with plaintiff in the distribution and sale of household equipment and appliances such as electric sewing machines and vacuum cleaners and any related products, and from infringing plaintiff's registered trade-mark "Admiral." Plaintiff was held not entitled to an accounting for profits. Admiral Corp. v. Penco, Inc., D.C.1951, 101 F.Supp. 677; Id., D.C. 1952, 106 F.Supp. 1015, affirmed by the Court of Appeals for the Second Circuit, 1953, 203 F.2d 517. The injunction ran against Penco, Inc., "its officers, agents, servants, employees, privies, successors and assigns."

Admiral Corporation, plaintiff, manufactures and sells, under the name "Admiral", a number of household devices which in recent years have come to be grouped under the term "appliances", they being radio sets, radio-phonograph combinations, electric refrigerators, electric cooking ranges, room air-conditioners, dehumidifiers, and power hand tools.

Plaintiff and its predecessors in title have registered the name "Admiral" in the Patent Office as a trade-mark for the appliances which it handles and for kindred goods, but not for vacuum cleaners or sewing machines.[4]

The first registration of the name "Admiral" for goods in the appliance field, August 5, 1930, No. 273,655, was for radio receiving sets, vacuum or electron tubes, and radio speakers. It was registered by Columbia Radio Corporation, assigned ultimately to Continental Radio and Television Corporation, a Delaware corporation, and renewed September 19, 1950. The second registration, for electric refrigerators, was issued January 11, 1944, to Continental on an application filed August 24, 1943. In November, 1943, Continental changed its corporate name to "Admiral Corporation." It is the plaintiff. All the other registrations were issued to Admiral.

1. Price Vacuum Stores of Erie, Inc., Price Vacuum Stores of New Jersey, Inc., Price Vacuum Stores of Delaware, Inc., Penn Machines Corporation, and Price Stores of New York, Inc.

2. Dorothy Price was Vice President until October 6, 1952, when she was succeeded in office by Raphael Bielitzky.

3. The individual defendants held the same offices in each of the subsidiaries.

4. Trademarks Nos. 273,655, 405,192, 407,-816, 409,912, 412,039, 440,438 and 549,-908.

An attempt by Price Vacuum Stores, Inc., to cancel these registrations did not succeed.[5]

Price Vacuum Stores, Inc., applied in November, 1949, for registration of the name "Admiral" as a trade-mark for electric vacuum cleaners, sewing machines, and parts, Serial Numbers 587,206 and 587,207. In opposition proceedings begun in September, 1950, by Admiral Corporation, the Examiner of Interferences in September, 1955, found the applicant not entitled to registration.

By the expenditure of many millions of dollars, plaintiff has succeeded in bringing the name "Admiral" and its products bearing that name to the attention of the public. From April, 1934, to August, 1955, its sales of appliances under that name amounted to $1,500,000,000. As a result of these advertising expenditures and sales, the name "Admiral", when used on household appliances, has come to mean to the public goods manufactured or sold by plaintiff. Further, the quality of the appliances made and sold by plaintiff under the name "Admiral" has caused the name to be known to the public favorably.

■ The word "admiral" is a common word. It has no spark of novelty, invention, or distinctiveness. Used as a trademark, therefore, it is one of those described in a number of cases, such as El Chico, Inc., v. El Chico Cafe, 5 Cir., 1954, 214 F.2d 721, and North American Aircoach Systems, Inc., v. North American Aviation, Inc., 9 Cir., 1955, 231 F.2d 205, as "weak" marks, contrasted to arbitrary, coined, or fanciful marks, such as "Kodak" which are characterized as "strong." Also "Admiral", in combination with other words and standing alone, has been registered in the Patent Office to persons other than plaintiff some 35 times for a wide variety of goods, including, among others, anchors, paper bags, watches, lubricating oils, and razor blades.

■ Weak marks are afforded a much narrower orbit of protection than are the strong. Sunbeam Lighting Co. v. Sunbeam Corporation, 9 Cir., 1950, 183 F.2d 969; National Drying Machinery Co. v. Ackoff, D.C.E.D.Pa.1955, 129 F.Supp. 389, affirmed 3 Cir., 1955, 228 F.2d 349.

■ In the case at bar I find that while the name "Admiral" is a "weak" one, and even though it has been used on a wide variety of articles many of which were not made by plaintiff, defendants' use of it on electric sewing machines and vacuum cleaners infringed plaintiff's rights in the name. The field of electrical household appliances is a narrow one. Plaintiff, by handling a large variety of goods in that field and by heavy advertising is so well known in the field that the average man contemplating the purchase of an appliance would probably think that all "Admiral" appliances come from a single manufacturer. Purchasers, therefore, are likely to be confused, mistaken, or deceived as to the origin of the goods. Admiral Corp. v. Penco, Inc., 2 Cir., 1953, 203 F.2d 517.

The defendant corporations operated retail stores in Pennsylvania, New York, New Jersey and Delaware cities, in all of which plaintiff's goods are sold. The principal method of selling vacuum cleaners and sewing machines was a system known to its admirers as "step-up", and to others as "switch" selling. The technique consisted of advertising used machines of well-known makes[6] at extremely low prices to get in touch with a possible buyer, showing the prospect an appliance of that make in an uninviting[7] condition, disparaging it, and trying instead to sell him a new vacuum cleaner or sewing machine bearing the name "Admiral." Effort was expended to discourage the prospect from buying

---

5. Price Vacuum Stores, Inc., v. Admiral Corporation, Cust. & Pat.App., 223 F.2d 269.

6. Electrolux and Singer, for example.

7. Characterized by one witness as "beat up."

the articles featured in the "bait" advertising.

If the sellers had applied no name to the goods they were trying to sell, or if they had applied some name not claimed by another, no manufacturer or merchant would have a cause of action of the kind asserted in this case. Therefore, the "step-up" or "switch" sales are important in the present case only in that they laid the groundwork for the palming-off of vacuum cleaners and sewing machines under the name "Admiral."

What gives rise to this suit, in addition to the actual use of the name, is the fact that when the salesman would produce a vacuum cleaner or sewing machine, with the name Admiral on it, the prospect would frequently make some comment or inquiry as to its being a product of the people who make "Admiral" television sets, refrigerators, etc.,: the plaintiff. At this point in the negotiations the salesman would often forego the opportunity to make a full and frank disclosure of the facts, and would resort to evasion or outright falsehood, deliberately leading the prospect to believe that the vacuum cleaner or sewing machine in question was made by the well-known and well-regarded manufacturers of "Admiral" television sets, refrigerators, etc.[8]

■ It is obvious from this that defendants' salesmen at times traded on plaintiff's name "Admiral", led prospects to believe that plaintiff was the manufacturer of "Admiral" vacuum cleaners and sewing machines, and, in short, palmed off these appliances as products of the plaintiff.

This palming-off by defendants' salesmen occurred so frequently in their selling efforts that the only conclusion that can be drawn is that the salesmen palmed

off because they found it a very helpful method and that their superiors knew of it and raised no serious objection to it despite testimony to the effect that salesmen were instructed to deny any connection with the plaintiff. The acts of the salesmen were the acts of the corporate defendants.

■ Since confusion was likely to occur and did occur, it is no defense that other matters, such as demonstrations, were inducements bringing about sales.

The corporations were run as a single unit. Eighty per cent of the stock of each corporation was held by the individual defendants. Defendant Jack Price owned 55% of the stock. He was the president, treasurer, a director, and the directing head. He made the decision to use the name "Admiral." He was aware that the salesmen used the "step-up" or "switch" selling device and he condoned it. He was consulted by the general manager and sales manager on important matters and although he would frequently acquiesce in their suggestions, he was recognized by these managers as having ultimate authority.

■ Occupying this controlling position and having exercised his control in this manner, Jack Price was responsible for the acts of the defendant corporations in using the name "Admiral" and palming off their appliances as those of the plaintiff, and is liable to plaintiff in this action. Saxlehner v. Eisner, 2 Cir., 1906, 147 F. 189, certiorari denied 203 U.S. 591, 27 S.Ct. 778, 51 L.Ed. 331; General Electric Co. v. Wabash Appliance Corp., 2 Cir., 1938, 93 F.2d 671; Conde Nast Publications v. Vogue School of Fashion Modelling, D.C.N.Y.1952, 105 F.Supp. 325, 333; Federal Trade Commission v. Standard Education Soc., 2 Cir., 1936, 86 F.2d 692, affirmed 1937, 302 U.S. 112, 58 S.

---

8. Deposition of Mrs. Morrison, p. 26:
   "Q. Did he say it had any association with the Admiral Company?
   A. He said, 'You know they make good television,' and I said, 'I know they did.' "

Deposition of Mrs. Weiss, p. 69:
   "A. He brought it in and took it out of the box and he said, 'Did you ever hear of an Admiral,' and I said, 'I am only familiar with Admiral television,' but he said they only began making sweepers."

Ct. 113, 82 L.Ed. 141. The fact that he did not personally negotiate sales does not in any way lessen or obviate this responsibility.

Dorothy Price, wife of Jack, owned 15% of the stock and was vice-president and a director. She never attended a directors' meeting, and had no active part in the management of the corporate defendants.

Isadore H. Schwartz owned 10% of the stock and was secretary, a director, and general counsel. He prepared the minutes of the corporations, signed them, prepared resolutions in connection with financing, and performed legal services. He also had no active part in the management of the corporations.

■ None of the defendants is entitled to infringe plaintiff's name "Admiral" in the household appliance field, and for that reason I have no hesitancy in concluding that plaintiff is entitled to have the injunction made final against all defendants, individual and corporate.

■ The statutory provision on damages appears at 15 U.S.C.A. § 1117:

"When a violation of any right of the registrant of a mark registered in the Patent Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled * * * subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. * * * *"

Since the parties have stipulated that the net profits of the corporate defendants made on the sales of vacuum cleaners and sewing machines under the trade-mark "Admiral" amounted to $184,000, there is no problem of proof of the existence or amount of profits.

Defendants strenuously maintain that there should be no award of these profits on the ground that since plaintiff's and defendants' goods did not compete, plaintiff has suffered no demonstrable loss, in sales or otherwise.

It seems scarcely equitable, however, for an infringer to reap the benefits of a trade-mark he has stolen, force the registrant to the expense and delay of litigation, and then escape payment of damages on the theory that the registrant suffered no loss. To impose on the infringer nothing more serious than an injunction when he is caught is a tacit invitation to other infringement.[9]

Champion Spark Plug Co. v. Sanders, 1947, 331 U.S. 125, at page 131, 67 S.Ct. 1136, at page 1140, 91 L.Ed. 1386, is authority for the proposition that infringement does not of itself give rise to an accounting for profits, but it is significant that the Supreme Court said: "Here, as we have noted, there has been no showing of fraud or palming off." National Dryer Manufacturing Corp. v. National Drying Machinery Co., D.C. E.D.Pa.1955, 136 F.Supp. 886, holds that damages will be awarded only when the equities require it. The case of National Drying Machinery Co. v. Ackoff, D.C. E.D.Pa.1955, 129 F.Supp. 389, affirmed 3 Cir., 1955, 228 F.2d 349, cited by defendants as authority for denying damages where an injunction has been granted, is distinguishable in that there was no showing of fraudulent use of the trade-mark or of intent to mislead customers or palm-off.

■ I believe that the present case is one where the equities require an award of damages. Plaintiff, by the testimony of nine customers, has shown that many instances of actual palming-off. It has also shown, by the testimony of Robert Pitteti, one of defendants' former salesmen, that palming-off by himself as well as others, was no rare occurrence. I find illuminating his testimony to the effect that sales were more easily made when he implied that the products were those of plaintiff or failed to correct customers who were under the mistaken impression that such was the case. It

9. Cf. 2 Nims, Unfair Competition and Trade-Marks, 1329 et seq.

may be thought inequitable that so small a number of actual instances of palming-off should be the basis for a large award of profits. It should not be lost sight of that defendants by stealing the name "Admiral" deliberately created this situation which invited both palming-off by salesmen and confusion in the minds of the public. These consequences were not only foreseeable but practically inevitable.

■ It is true, of course, that these profits were in a substantial part the fruit of the active defendants' own legitimate endeavors. "Under the rule of the Mishawaka case [10] * * * the infringer, in order to reduce the profits for which he would otherwise be answerable, must show to what extent they are 'demonstrably not attributable to the unlawful use.'" Century Distilling Co. v. Continental Distilling Corp., 3 Cir., 1953, 205 F.2d 140, 144. There is nothing in the record to establish what portion of the corporate defendants' profits resulted from infringing and what portion resulted from legitimate activity. The defendants have not carried the burden of proof to reduce the profits to which plaintiff is entitled.

■ There remains the question of an award of damages against defendant Jack Price who, being the directing head of the corporations, was as much at fault as the corporations, although it was not established that he had actual knowledge of the palming-off. He received no dividends on his stock, but did receive substantial salaries during the period of the infringement. He, too, has failed to establish to what extent his salary is not attributable to the unlawful use. Total net sales of the defendant corporations as shown by the financial reports of Arthur F. Morton & Co.

Year ending Nov. 30, 1950 $1,358,494.96
Year ending Nov. 30, 1951 $1,304,086.96
Year ending Nov. 30, 1952 $1,887,187.58
Adding sales of the first two years and

an arbitrarily-determined 9/12ths of the third (the restraining order was issued on September 2, 1952, and sales under the name "Admiral" ceased at that time) produces a total of $4,077,972.59. The total sales by defendant corporations of new vacuum cleaners and new sewing machines as reported by S. D. Leidesdorf & Co., Certified Public Accountants, were $4,597,877.49. The sales of defendants' "Admiral" products from Sept. 1, 1949, to Aug. 31, 1952, as set forth in the Reports of Roy M. Kaller, Certified Public Accountant, and S. D. Leidesdorf & Co., Certified Public Accountants, were as follows:

| | |
|---|---|
| Vacuum cleaners | $1,995,053.99 |
| Sewing machines | $1,488,941.65 |

The total of these two amounts is $3,483,995.64, or approximately three-quarters of the total net sales for approximately the same period. Three-quarters of defendant Jack Price's salary, therefore, can fairly be attributed to sales of "Admiral" products.

Defendant Jack Price testified that his salary was as follows:

| | |
|---|---|
| 1949 | either $15,000 or $18,000 |
| 1950 | either $15,000 or $18,000 |
| 1951 | either $15,000 or $18,000 |
| 1952 | $30,000 |

Taking the mean, or $16,500, for the first three years, his salary for the period September 1, 1949 to August 31, 1952, was:

| | |
|---|---|
| 9/1/49 to 12/31/49 | $ 5,500 |
| 1/1/50 to 12/31/50 | 16,500 |
| 1/1/51 to 12/31/51 | 16,500 |
| 1/1/52 to 8/31/52 | 20,000 |
| | $58,500 |

Considering all of the factors in the case, damages will be awarded against him in the amount of 75 per cent of his salary.

■ A decree may be submitted (1) making permanent the preliminary injunction heretofore granted, (2) award-

10. Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 1947, 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381.

ing damages in favor of plaintiff (a) against the corporate defendants and their trustee in the sum of $184,000, and (b) against defendant Jack Price in the sum of 75 per cent of the salaries paid him by the corporate defendants from September 1, 1949, to August 31, 1952, and (3) dismissing the claim for money damages against Dorothy Price and Isadore H. Schwartz.

The facts and law stated herein constitute the court's findings of fact and conclusions of law.