## CENTURY DISTILLING CO. v. CONTINENTAL DISTILLING CORP.
### (two cases).
### Nos. 10716, 10717.

United States Court of Appeals Third Circuit.

Argued May 7, 1953.

Decided June 17, 1953.
Rehearing Denied July 21, 1953.

See, also, D.C., 102 F.Supp. 39.

Joseph S. Clark, Jr., Philadelphia, Pa. (Barnes, Dechert, Price, Myers & Rhoads, Philadelphia, Pa., Arthur E. Newbold, III, Philadelphia, Pa., Miller, Westervelt, Johnson & Thomason, Peoria, Ill., Donald G. Beste, Peoria, Ill., on the brief), for Century.

Robert T. McCracken, Philadelphia, Pa. (Leonard L. Kalish, Philadelphia, Pa., Earl Jay Gratz, Philadelphia, Pa., on the brief), for Continental Distilling Corp.

Before BIGGS, Chief Judge, and GOODRICH and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge.

In this trade-mark infringement suit both the adjudged infringer, Century Distilling Company (Century), and the infringed, Continental Distilling Corporation (Continental), appeal. The former would have us hold that it need not account for profits or damages despite the finding of infringement, the latter that its award is inadequate.

Continental, a Delaware corporation, was organized in April, 1933, as a subsidiary of a corporation which had been manufacturing alcohol since 1912. With the repeal of prohibition in December, 1933, Continental began to sell Dixie Belle and Dixie Beaux gin to the public,[1] engaging in an extensive advertising campaign on behalf of Dixie Belle in 1933 and 1934. On February 13,

1. It had adopted and used these marks in connection with sales of gin to the prescription trade since several months prior to repeal.

1934, Continental registered the trade-marks Dixie Belle and Dixie Beaux with the United States Patent Office.[2] Although both marks were to be applied to other distilled alcoholic beverages as well as gin, we are here chiefly concerned with the use of the mark Dixie Belle on gin and gin products.

Century, an Illinois corporation, was organized in November, 1933, as a subsidiary of a grain and feed corporation. It began the sale of bottled liquors early in 1934 and on September 24, 1934, filed an application in the Patent Office for registration of the trade-mark Dixiana, claiming to have used the mark since September 10, 1934. Continental filed a notice of opposition thereto within two months. On March 9, 1935, Century applied for another registration, this time for the trade-mark Dixie Dew, claiming to have used the mark since February 20, 1935. Again Continental promptly filed a notice of opposition to the application alleging, as in the case of Dixiana, that this mark infringed its own prior-registered marks, Dixie Belle and Dixie Beaux. On October 28, 1936, after the taking of evidence, both notices of opposition were sustained by the Examiner of Trade-Mark Interferences. These decisions were affirmed by the Assistant Commissioner of Patents on July 2, 1937. In the meantime Continental had tried without success to persuade Century to discontinue voluntarily its use of the marks Dixiana and Dixie Dew.[3] Century manufactured and sold Dixie Dew whiskey and Dixiana gin until June 30, 1939, the date on which we affirmed the lower court's interlocutory decree. Dixie Dew whiskey constituted approximately 30% of the total number of cases of all liquors sold by Century during the period covered by the account. In 1943 Century sold its business to another distilling corporation at a substantial profit.

On July 28, 1937, Century brought suit against Continental under Section 4915 of the Revised Statutes, as amended,[4] for a determination of its right to register the two trade-marks. Continental counter-claimed for an injunction and an accounting. The district court, in an interlocutory decree filed June 27, 1938, dismissed the bill on procedural grounds. With respect to the counterclaim the court held that Century's marks Dixiana and Dixie Dew infringed Continental's Dixie Belle and Dixie Beaux, that Century's marks were a colorable imitation of Continental's, that they were calculated or liable to cause confusion, mistake or deception in the minds of the public, that both Century's and Continental's goods were of the same descriptive character and properties and were sold in interstate commerce. It concluded that Century's use of the marks constituted an infringement and ordered "the usual accounting" to be taken on reference to a master. On appeal to this court, 1939, 106 F.2d 486, the decree was affirmed.[5] The United States Supreme Court denied certiorari, 309 U.S. 662, 60 S.Ct. 581, 84 L.Ed. 1010. It is conceded, however, that the propriety of ordering an accounting was not argued during any of the above proceedings.

The accounting before the master commenced early in 1940. In June, 1943, Century moved the district court for a modification of the interlocutory decree, arguing that under the then recently decided case of Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381, it was not liable to Continental for profits on its sales of Dixie Dew whiskey. The motion was denied. The master filed Parts I and II of his re-

2. Numbers 310,075 and 310,149, respectively.

3. In the case of Dixiana it offered, prior to the Examiner's decision to pay Century a reasonable sum for such voluntary discontinuance. Shortly after the Examiner's decision Continental threatened suit in the federal courts in the event Century continued to use the mark Dixie Dew. Both attempts were unsuccessful.

4. 35 U.S.C. § 63 [1952 Revision, 35 U.S. C. §§ 145, 146].

5. The dismissal of Century's bill was affirmed on the merits. There was a reversal as to that part of the decree, not here pertinent, which had granted Continental the right to recover penalties under a Pennsylvania statute.

port on November 17, 1948, and Part III on February 21, 1951. Altogether almost 10,000 pages of testimony were taken. On December 20, 1951, the district court entered judgment against Century on Continental's counterclaim in the amount of $129,296.20. This figure represents 25% of Century's profits ($110,248.95) on its sales of Dixiana and Dixie Dew products during the accounting period (June 30, 1935, to June 30, 1939), plus interest and costs. The only item of damages to Continental which had been included in the master's award was disallowed by the court. As stated, Century appeals on the ground that it need pay none of its profits on account of the infringement while Continental is dissatisfied with the award, contending that it is entitled to all Century's profits on the infringing goods plus several items of damages. Century also argues that the master erred in disallowing certain overhead charges as a deduction from profits. Both parties contest various other items allowed or disallowed by the master and the court below on this accounting.

This action is governed by Sections 16 and 19 of the Trade-Mark Act of 1905, 15 U.S.C. §§ 96 and 99 [6].

## Century's Appeal

Century does not, and indeed cannot, dispute the determination of infringement, but argues that it has established that there was no palming off, no fraud and no confusion of source and therefore it should not be held to account for even 25% of its profits on the infringing goods. Reliance is placed on cases holding that while an injunction is proper where an infringement has been found no accounting will be ordered absent a showing of confusion. See, for example, Straus v. Notaseme Hosiery Co., 240 U.S. 179, 36 S.Ct. 288, 60 L.Ed. 590; Durable Toy & Novelty Corp. v. J. Chein & Co., 2 Cir., 1943, 133 F.2d 853, certiorari denied, 320 U.S. 211, 63 S.Ct. 1447, 87 L.Ed. 1849; Coca Cola Co. v. Snowcrest Beverages, Inc., D.C.Mass.1946, 64 F.Supp. 980, affirmed, 1 Cir., 1947, 162 F.2d 280, certiorari denied, 332 U.S. 809, 68 S.Ct. 110, 92 L.Ed. 386.

**6.** Repealed by the Act of July 5, 1946, The Lanham Act, Ch. 540, Section 46(a), 60 Stat. 444,

15 U.S.C. §§ 96 and 99 read as follows:
"§ 96. Evidence of ownership; infringement, and damages therefor

"The registration of a trade mark under the provisions of this subchapter shall be prima facie evidence of ownership. Any person who shall, without the consent of the owner thereof, reproduce, counterfeit, copy, or colorably imitate any such trade mark and affix the same to merchandise of substantially the same descriptive properties as those set forth in the registration, or to labels, signs, prints, packages, wrappers, or receptacles intended to be used upon or in connection with the sale of merchandise of substantially the same descriptive properties as those set forth in such registration, and shall use, or shall have used, such reproduction, counterfeit, copy, or colorable imitation in commerce among the several States, or with a foreign nation, or with the Indian tribes, shall be liable to an action for damages therefor at the suit of the owner thereof; and whenever in any such action a verdict is rendered for the plaintiff, the court may enter judgment therein for any sum above the amount found by the verdict as the actual damages, according to the circum-

stances of the case, not exceeding three times the amount of such verdict, together with the costs. Feb. 20, 1905, c. 592, § 16, 33 Stat. 728.
\* \* \* \* \* \* \*
"§ 99. Injunctions; recovery and assessment of damages

"The several courts vested with jurisdiction of cases arising under this subchapter shall have power to grant injunctions, according to the course and principles of equity, to prevent the violation of any right of the owner of a trade mark registered under said subchapter, on such terms as the court may deem reasonable; and upon a decree being rendered in any such case for wrongful use of a trade mark the complainant shall be entitled to recover, in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby, and the court shall assess the same or cause the same to be assessed under its direction. The court shall have the same power to increase such damages, in its discretion, as is given by section 96 of this chapter for increasing damages found by verdict in actions of law; and in assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost which are claimed. Feb. 20, 1905, c. 592, § 19, 33 Stat. 729."

Despite a brilliantly presented argument on its behalf Century's fundamental difficulty of necessity remains, namely, that in order for it to prevail we must reverse the district court's (and master's) findings of fact as being clearly erroneous or hold that as a matter of law an accounting should never have been ordered. The facts on which the findings are based and the applicable law do not justify either course.

■ Under the rule of the Mishawaka case, supra, which it is agreed governs these situations, the infringer, in order to reduce the profits for which he would otherwise be answerable, must show to what extent they are "demonstrably not attributable to the unlawful use." The master was aware that Century's burden was a difficult one, stating that if the equities and burden of proof were reversed he would not hesitate to reduce the recoverable profits even further than he did. He also pointed out that while accuracy in this type of case is impossible of attainment Century had not shown that more than 75% of its profits on Dixie Dew whiskey was not attributable to infringement. The master properly noted that if a windfall is to result from the failure to achieve mathematical precision in gauging the percentage of the infringer's sales not attributable to confusion it belongs to the wronged, not the wrongdoer. See Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 207, 62 S.Ct. 1022, 86 L.Ed. 1381. The court below accepted the master's 25% figure. After an examination of the evidence we cannot say that this constituted clear error.

It is true, of course, that if the district court in 1938 had refused to order an accounting Century would not have been held liable for a portion of its profits—assuming the court would not have been reversed on appeal. The fact is that the question of Century's liability for profits or damages was not argued to the trial court at that time nor to us on appeal. In the circumstances the statute required that an ac-

counting be had. At the very least, it cannot be said that as a matter of law Continental was not entitled to such accounting.

■ Century contends that we are not bound by the law of the case insofar as the interlocutory decree directed an accounting of profits and damages. We agree that in a proper setting—one in which there could be no showing of pecuniary harm to the infringed—it may be the appellate court's duty to vacate an order of accounting, even after fifteen years' litigation. In our view this is not such a case. It is Century's belief that the evidence adduced before the master coupled with the comments of the lower court conclusively show that there was no confusion. As we have earlier stated, under the Mishawaka rule the burden was on Century to prove the fact that its profits were not attributable to the infringement. It is possible that had Continental been saddled with the burden of affirmatively demonstrating the converse it would have presented more evidence of confusion. Be that as it may, the record shows that Century's own witnesses, many of them trade-witnesses, testified that there was confusion between the brand names Dixie Belle and Dixie Dew and that consumers are aware of brand names, not names of manufacturers, when they purchase liquors. When this fact is coupled with the master's finding that Dixie Dew was in direct competition with Dixie Belle [7] it cannot be contended that the district court, even if it had been gifted with the clairvoyance to foresee what the proofs before the master would show, should, in its interlocutory decree, have denied Continental an accounting as a matter of law.

Century is very much encouraged by what it calls a finding by the court below that the similarity did not cause confusion. Since this proposition is repeated many times in Century's briefs and was urged at the oral argument we must, at the risk of unduly burdening this opinion, discuss it rather fully. After the master had submitted his interim report the district court .

7. Dixie Dew, although a cheap whiskey, sold at approximately the same price as Dixie Belle, a quality gin, gins as a class being lower-priced than whiskeys as a class. Both products were sold, to a certain extent at least, in the same geographical areas.

was asked by the parties to pass on certain specific issues which were considered important. The court did so in an opinion filed on December 8, 1949. Eleven principal points were made, some of which affirmed the master's determinations, some of which reversed him. They were set out in the form of conclusions and were followed by explanatory notes. The third point states: "Century is not entitled to any deduction for interest on investment." The master had concluded that while it was inconsistent with the differential or marginal profit theory of accounting [8] to allow the infringer interest on its investment in the infringing goods, the case law compelled this result. He therefore allowed Century such interest as a credit. The court refused to accept this proposition, finding that whether interest should be allowed depended on whether the infringement was wilful and deliberate. The trial judge noted that three kinds of infringement are generally recognized in patent and trade-mark cases—innocent, wilful and fraudulent. After stating that "it certainly was not innocent", he said:

"But in this case there can be no possible question that Century's conduct was willful, undertaken and persisted in with full knowledge of Continental's rights, and, if it adds anything, it can also be characterized as deliberate. It was not fraudulent if 'fraudulent' be taken, as it generally is, to mean an intent to deceive the public as to the nature or origin of the goods. In other words, I do not believe that Century intended or expected anyone to buy Dixie Dew bourbon whisky under the impression that they were buying Dixie Belle gin. *Nor do I believe that Century intended or expected that the public, in buying Dixie Dew, would think that they were buying a product of the Continental Distilling Company although this result may actually have occurred in a few negligible instances.* The fact is that Century thought that it had a good trademark which would sell its goods, that it knew that Continental was building up a reputation by the use of a similar, although not identical, trademark and that it was quite willing to go into very large-scale production and sale of the article, with at least a presumed knowledge that it had no right to it, and taking the risk it might be held an infringer.

"Therefore, inasmuch as this infringement was willful, I think the only proper and logical course is to disallow all interest on investment as a deduction." (Emphasis supplied.)

It is the italicized language in this note which is seized upon as indicating that the district court found that the similarity did not cause confusion. While stating his belief that *Century did not intend or believe* that its whiskey would be purchased under the impression it was Continental's gin or a product of Continental at all, the district judge did not expressly say or inferentially hold that the similarity between the Century Dixie Dew name and that of Continental's Dixie Belle did not cause confusion. Clearly the court neither purported nor intended to make such a finding, particularly in view of the fact that the master in his interim report, which had been submitted to the court prior to the rendition of the above opinion, discussed at some length the factors which he believed indicated that confusion with or response to the "diffused appeal" of Dixie Belle favorably affected sales of Dixie Dew. These factors included, *inter alia*, "companion-product confusion" [9] and "response to 'familiar

---

8. Discussed infra.

9. The master said in part:
"The diffused appeal or familiar ring of the name could readily have suggested to a prospective bourbon buyer that Dixie Dew might partake of the same quality and value among bourbons as that enjoyed by Dixie Belle among gins; that something of the known quality and value of the higher-priced gin might be obtained in the lower-priced bourbon; *or* that the two brands were produced and distributed by the same distiller and that the cheaper whiskey perhaps also drew upon the assurances and warranties of his integrity, skill and experience." (Emphasis supplied.)

ring' or sound of name." [10] Even if the district court's above-quoted language is taken to be a *finding*, as claimed by Century, that there was no confusion of source in the sense that purchasers of Dixie Dew whiskey believed they were buying a Continental product (which is clearly not justified), Century falls far short of having established that there was no confusion between the infringing and infringed marks.

 Century takes the view that in the absence of confusion of source there is no basis for an award of profits or damages. This is not, in our opinion, a correct statement of the law if "confusion of source" is taken to mean a conscious belief on the part of the buying public that Dixie Dew whiskey was manufactured by Continental.[11] Justice Frankfurter, speaking for the majority in the Mishawaka case, recognized that an infringer may be liable for profits realized because of a "response to the diffused appeal of the plaintiff's symbol," 316 U.S. 206, 62 S.Ct. 1024. Furthermore, 316 U.S. at page 207, 62 S.Ct. at page 1025, he said:

"In the absence of his proving the contrary, it promotes honesty and comports with experience to assume that the wrongdoer who makes profits from the sales of goods bearing a mark belonging to another was enabled to do so because he was drawing upon the good will generated by that mark." [12]

 As noted, the master was cognizant of the distinction between confusion of source in the narrow, restricted sense and the broader concept of diffused appeal. Note 9, supra. He was equally aware that there could be a recovery for impairment of the good will of the Dixie Belle trademark, although he disallowed damages on this ground because he felt they would duplicate his award of profits.

If, on the other hand, confusion of source as used by Century has a broader meaning than that we have ascribed to it above, i. e., if it is the equivalent of response to diffused appeal, loss of good will, etc., we are unable to agree, from the evidence, that the order to account should be vacated as a matter of law or that the award should be reversed because clearly erroneous.

Century also feels aggrieved because the master and the court below refused to charge certain non-variable expenses (overhead) against profits on Dixie Dew. Despite the fact that during the four years embraced by the accounting Dixie Dew was Century's best seller, gross sales totalling $6,175,599.24 by Century's own figures, it was claimed that it had sustained a loss of $21,861.23 on that product.[13] As a starting point in computing Century's profits the master used the various bookkeeping and accounting entries appearing in that corporation's books. It was found that many items in "cost of sales", "selling ex-

---

10. In his discussion of this subject the master said:

"It is also a matter of common knowledge that a purchaser will respond to the impulse to try a recognized or suggested brand in preference to an unknown or unfamiliar brand, in the absence of other inducements. The familiar ring or sound of the name Dixie Dew, for which, under the findings of the Court in this case, we must assume that Continental's Dixie Belle was responsible, could conceivably have sold appreciable quantities of Dixie Dew for Century as a matter of quick response to catch-phrase recognition (possibly without even a conscious identification in the mind of the purchaser with any specific recognized or remembered commodity)."

11. Century's position is not improved by

virtue of Continental's concession at oral argument that it never claimed such direct confusion existed. The master had already stated that direct confusion was "negligible or even non-existent."

12. It seems obvious that the majority did not employ this language without considering its significance, since the dissenting opinion expressed the belief that an injunction would suffice because the trial court had concluded that there was "no direct proof of any ordinary purchaser being misled into believing that heels marketed by the defendant were products of the plaintiff company."

13. This figure is from Century's revised account filed November 10, 1941. In an earlier account, filed April 1, 1940, Century showed a loss of $76,142.90 on Dixie Dew.

penses" and "general and administrative expenses"—all of which, of course, served to reduce the amount of profits attributable to Dixie Dew—were of a fixed or non-variable character and would have been incurred even had Century not manufactured the infringing goods, e. g., taxes, depreciation and insurance. Other items were variable, increasing as production increased, e. g., supplies and raw materials. A third class consisted of items which were partly variable and partly non-variable, i. e., which up to a point would be incurred in any event but which would increase as that point (of production) was passed. Included in this mixed group, too, were items of expense which, in the words of the master, "[varied] with increased production but not in direct proportion thereto." Typical items in this class were labor and fuel.

The master, applying the so-called differential cost or marginal profit theory, disallowed all non-variable expenses, allowing the expenses in the mixed group only to the extent that they were incurred because of the production of Dixie Dew.[14] He observed that as matter of internal bookkeeping or accounting such charges would be proper but was of the opinion that they should not be permitted to offset profits on this accounting, particularly since allocations of these expenses to Dixie Dew were either arbitrary or "matters of interpretive accounting subject to the choice or whim of Century's accountants."[15] He correctly noted that the use of the differential cost theory made possible the dis-

covery of concealed or incidental profits—in the form of charges which but for the infringement would have been made against the non-infringing part of Century's business—properly allocable to Dixie Dew.

We are told by Century that the differential cost theory is inapplicable to this case because no fraud has been shown. The authorities do not indicate that a finding of fraud is required. In the leading case of Tilghman v. Proctor, 125 U.S. 136, where this theory was applied, there appears to have been no showing of fraud—on the contrary, interest was disallowed plaintiff because the validity of the infringed patent was "in earnest controversy." See also Christensen v. National Brake & Electric Co., D.C.E.D.Wis.1926, 10 F.2d 856, modified, 7 Cir., 1930, 38 F.2d 721, certiorari denied, 282 U.S. 864, 51 S. Ct. 36, 75 L.Ed. 764.[16] An alternative theory would permit the infringer to allocate all items of overhead and fixed expenses on a percentage basis[17] to the infringing goods. Although this method is used in many accountings,[18] possibly for convenience and expedition (the differential cost theory requires a much more painstaking and time-consuming accounting, often unjustified), we are not persuaded that the master erred in refusing to apply it in this case in preference to the differential cost theory.

The remaining points raised by Century may be disposed of briefly. They relate to the disallowance as deductions of certain

14. Throughout this opinion, the opinions of the district court and the report of the master there is very little separate discussion concerning Dixiana gin. The master found that, compared to Dixie Dew, sales of Dixiana were de minimis. Accordingly, in the interest of simplification the profits realized on Dixiana ($759.40) were determined in the same manner as those realized on Dixie Dew, without, however, a separate detailed account.

15. He commented further: "In either case, the Master is afraid that the opportunity for profit was too clearly apparent to both officers and accountants of Century—fully cognizant as they were at all times of Century's possible liability to

Continental for infringements profit—to permit the Master to believe that their decisions could have been unaffected by self-interest, or premised on pure accounting theory."

16. The Court of Appeals there affirmed the disallowance of exemplary damages on the ground that the plaintiff's case was not strong enough to justify disturbing the district court's ruling.

17. Total sales of the infringing commodity over total sales of the infringer's entire business.

18. Duro Co. of Ohio v. Duro Co. of New Jersey, 3 Cir., 1932, 56 F.2d 313, is a case in which we approved this method of determining an infringer's profits.

items of non-variable expenses and the partial disallowance of items which were variable only to a degree. Typical totally disallowed items were fire and tornado insurance, real estate taxes and labor on repairs. Under the differential cost theory, which we approve in this case, these fixed expenses were properly disallowed. Other items—salesmen's salaries and expense, general sales office expense and general and administrative expense—were partially allowed to the extent that they were found to be attributable to the production of Dixie Dew. We perceive no error in this phase of the accounting.

Century makes specific objections to the manner of computing deductions for freight charges. The court below, while recognizing that freight was properly allocable as an expense, held that because of Century's failure to keep records of the exact amounts of freight charges incurred on Dixie Dew products—even though it had notice that it might ultimately have to account as an infringer—the court would assume that Dixie Dew was shipped in carload lots only. While this assumption reduced the actual freight charges incurred, under the circumstances we cannot say the court below erred. The same is true of the disallowance of estimated discounts, returns and allowances. These, however, were rejected in toto because, unlike freight, there was no proved minimum.

After an examination of the applicable law we affirm the disallowance of interest on Century's investment in Dixie Dew and of federal income and excess profits taxes. There is likewise no merit in Century's argument that the cost of the accounting should be borne by Continental.

## Continental's Appeal

Continental complains because it was awarded only 25% of Century's profits on sales of Dixie Dew. Its specific assignments of error are two: (1) that the trial court misconceived the quantum of proof imposed on infringers by Mishawaka and (2) that Century has failed to demonstrate that 75% or any other part of its profits on the infringing goods was not attributable to the infringement.

The first argument—that the use of the word "demonstrably" in the Mishawaka case imports a higher standard of proof than the usual fair preponderance of evidence rule of civil cases—was considered and rejected by the district judge. We agree with him that "demonstrably" was used merely as meaning "capable of being shown or made evident by reasoning or proof" and therefore hold that the Mishawaka case does not impose a different burden of proof on infringers than the customary civil rule.

As to the master's finding, adopted by the trial court, that Century has proved 75% of its profits on Dixie Dew to be non-attributable to the infringement, it must be borne in mind that he was in close touch with this case for many years, that he heard dozens of witnesses and took thousands of pages of testimony. His report is lucid, fair and well reasoned. In arriving at the 25% figure he found many factors which indicated non-confusion.[19] While we might conceivably have arrived at a different figure had we been the triers of fact, a review of the evidence compels the conclusion that the master's determination is not erroneous.

It is next argued that Continental was improperly disallowed damages on account of the infringement. Continental sought three items of alleged damages: (1) loss due to depression of price of Dixie Belle, (2) loss of profit on loss of sales during the two and one half years' post-in-

19. Among these factors are the following:
 1. Dixie Dew, a cheap bourbon, appealed to a different class of purchasers than Dixie Belle, an expensive gin.
 2. Dixie Dew sold well in areas where Dixie Belle had little or no acceptance.
 3. Purchasers of a cheap whiskey were not very susceptible to the appeal of Dixie Belle advertising.
 4. Because the demand for whiskey exceeded the supply immediately after repeal, brand appeal was not necessary to capture the initial market.
 5. There were a considerable number of anonymous sales of Dixie Dew in bars.
 6. During the infringement period Dixie Belle was not as well known as it is today.

fringement period[20] and (3) loss or impairment of Dixie Belle's good will. As to the first, the master found Continental's proofs "entirely inadequate" and disallowed it. He also awarded no damages for the third item, stating that there was "no convincing evidence in the record of permanent injury to, or impairment of, Dixie Belle's goodwill, other than loss of sales."[21] He somewhat reluctantly permitted Continental to recover 13% of its claimed losses of profit on lost sales during the post-infringement period, despite the dearth of evidence relating to the adverse effects of Dixie Dew's infringement on those sales. The district court, however, disallowed all claims for damages, including lost sales during the post-infringement period. The reason for reversing the master on the latter point, according to the court, was that in the accounting of profits no distinction had been made between Dixie Dew whiskey which reached the ultimate consumer before and after the effective date of the injunction. Thus it was entirely possible that Continental would, if allowed these damages, recover twice—once in Century's accounting for profits and again in the assessment of damages. The principle that such a double recovery is not permitted was recognized in Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 208, 62 S.Ct. 1022, 86 L. Ed. 1381. See also Obear-Nester Glass Co. v. United Drug Co., 8 Cir., 1945, 149 F.2d 671, 674, certiorari denied, 326 U.S. 761, 66 S.Ct. 141, 90 L.Ed. 458, and Restatement of Torts, Section 747, Comment

b. Continental, having chosen to recover Century's profits on Dixie Dew, cannot also recover damages for lost sales. The district court's action was proper.

Insofar as damages for items (1) and (3), supra, were disallowed a question of fact is presented. We are satisfied that the master's determinations do not constitute reversible error.

Most of Continental's remaining points relate to allowances, total or partial, of expenses claimed by Century and which, of course, reduced Continental's recovery. They, too, are principally concerned with factual determinations which, upon an examination of the record, we are loath to disturb.

██ Finally, we are told that the district court should have allowed Continental its litigation expenses. It would seem that such expenses may be allowed as damages in an infringement suit if there is a showing of fraud. Aladdin Mfg. Co. v. Mantle Lamp Co., 7 Cir., 1941, 116 F.2d 708, certiorari denied, 296 U.S. 639, 56 S.Ct. 173, 80 L.Ed. 454; General Motors Corp. v. Circulators & Devices Mfg. Corp., D.C.S.D. N.Y.1946, 67 F.Supp. 745. Cf. Blum v. William Goldman Theatres, Inc., 3 Cir., 1947, 164 F.2d 192. Here no such finding has been made. While it is arguable that they may be awarded as costs at the discretion of the court, the trial judge did not believe this case warranted such action. There is no showing that he thereby abused his discretion.

The judgment will be affirmed.

20. From June 30, 1939 to December 31, 1941.

21. The master noted that while Continental had claimed a reduction of good will from $2,367,500 on December 31, 1936, to $131,220 on December 31, 1941, its sales of Dixie Belle in 1942 were almost double those of its best preinfringement years.