**MONSANTO CHEMICAL COMPANY,** Successor by merger to The Chemstrand Corporation, Appellee-Appellant (Plaintiff),

v.

**PERFECT FIT PRODUCTS MANUFAC-TURING CO., Inc.,** Appellant-Appellee (Defendant).

No. 384, Docket 29179.

United States Court of Appeals Second Circuit.

Argued March 17, 1965.

Decided July 28, 1965.

Walter H. Free, New York City (Brumbaugh, Free, Graves & Donohue, and John F. Neary, Jr., Richard A. Lochner, New York City, on the brief), for appellee-appellant (plaintiff).

Jay F. Gordon, New York City (Natanson, Gordon & Reich, and Melvyn Altman, New York City, on the brief), for appellant-appellee (defendant).

Before LUMBARD, Chief Judge, and MOORE and MARSHALL, Circuit Judges.

LUMBARD, Chief Judge:

The issue on this appeal is whether the district court erred in refusing to allow an accounting of the profits gained by the defendant through its deliberate infringement of the plaintiff's trademark on the ground that the parties were not in direct competition. We conclude that the public interest in deterring fraudulent sales practices requires that such an accounting be allowed, and we therefore remand the case for such accounting.

The facts, as found by Judge McLean after a trial at which the defendant adduced no evidence, are undisputed. The plaintiff, Monsanto Chemical Co., produces an acrylic fiber, which it markets under the registered trademark "Acrilan." This mark was registered under the Lanham Trademark Act of 1947, 15 U.S.C. § 1051 et seq. The defendant, Perfect Fit, deliberately infringed this mark by selling mattress pads falsely labeled as Acrilan-filled. The pads were produced for Perfect Fit by the Carolina Manufacturing Co., which was in effect Perfect Fit's manufacturing division.[1]

After initial discussion between Perfect Fit and Monsanto concerning manufacture of a 100 per cent Acrilan-filled coverlet, Perfect Fit decided in March of 1958 to market an "Acrilan" mattress pad instead. It ordered some 20,000 pounds of acrilan fiber from Monsanto and 30,000 "Acrilan"-labeled polyethylene bags from a supplier. The first pads were shipped in late April, but Monsanto did not learn of them until late May and then only through a trade publication; all of the prior communications between the parties had concerned the proposed coverlet.

Monsanto tested one of the pads, supplied at its request by Perfect Fit, and found that it contained only 8.5 per cent acrylic fiber, the rest being rayon. When confronted with this finding, Perfect Fit explained that Carolina must have made a mistake, and it promised to send another sample with 100 per cent Acrilan. The second sample never arrived.

Monsanto then purchased a number of the Perfect Fit pads in retail stores. All these pads, labeled as Acrilan mattress pads, contained less than 25 per cent of acrylic fiber and some contained none whatever. The rest of their fill consisted of cotton, acetate, nylon and other fibers, mixed in various proportions. Some of the fibers were second-hand waste material, such as fibers from floor sweepings, which contained considerable amounts of dust.

The labels on the pads claimed that the pads were "completely sanforized to prevent shrinkage" and "allergy—dustproof—mothproof—will not mildew." Each of these claims was false. In addition, the covers for the pads, as the district court found, were made of

"cheap, poor quality cloth, low in thread count and heavily sized with 30 per cent by weight starch and talc to give the appearance of good quality cloth. As evidenced by before and after washing specimens, the sizing rinsed out with a single washing leaving a dust-porous, rough fabric having an inferior appearance."

---

1. Carolina was owned by Manuel Fisher, a former employee of Perfect Fit and a brother-in-law of Perfect Fit's president. During 1958—the year involved in this case—all of Perfect Fit's products were produced by Carolina, and over 90 per cent of Carolina's sales were to Perfect Fit. Perfect Fit itself purchased the raw material and labels, and it gave Carolina detailed instructions regarding manufacture of the pads.

At a meeting on July 25, Perfect Fit admitted the mislabelling, and, on Monsanto's insistence, supplied what purported to be a list of the customers for the pads. In fact, however, the largest customer was not on the list.

The parties again conferred in August, and Perfect Fit proposed to manufacture a nylon-Acrilan pad, so labeled. Nothing came of this, however, and Monsanto brought suit in November in the Southern District, alleging infringement of its trademark and unfair competition. Jurisdiction was based on 28 U.S.C. § 1338. In December, Perfect Fit consented to a preliminary injunction.

Following a trial without a jury, Judge McLean found that Perfect Fit had infringed Monsanto's trademark, that its acts constituted unfair competition, and that it had acted "wilfully with full knowledge of plaintiff's rights and as part of a pre-conceived plan to trade upon plaintiff's goodwill." He granted a permanent injunction and awarded $15,877.-88 legal fees. However, he found that Monsanto had failed to prove that it had sustained any damage, and he concluded that an accounting could not be allowed since the parties are not competitors; this latter conclusion he regarded as being required by our decisions in Admiral Corp. v. Penco, Inc., 203 F.2d 517 (2 Cir.1953) and Triangle Publications, Inc. v. Rohrlich, 167 F.2d 969 (2 Cir. 1948).

Both parties appeal. Perfect Fit objects to the award of legal fees on two grounds: first, since prior to trial it had proposed a consent decree as broad as the injunction ultimately ordered by Judge McLean, Monsanto gained nothing from the trial and was in fact an unsuccessful litigant; and, second, that the award is excessive. Monsanto's appeal attacks both Judge McLean's finding that it has not adequately proved damages and his conclusion that an accounting is unavailable since the parties are not competitors.

■ We affirm Judge McLean's refusal to award damages. However, we hold that an accounting should be allowed on the facts of this case, and we overrule Admiral Corp v. Penco, Inc., supra, and Triangle Publications, Inc. v. Rohrlich, supra, so far as they are inconsistent with our holding in the present case. We therefore remand for an accounting of the defendant's profits resulting from its infringement of the Acrilan trademark.

■ With respect to the defendant's appeal, since the relief ultimately granted will go beyond that offered by the defendant in settlement prior to the trial, we do not reach the question whether an award of legal fees would otherwise have been improper. We find that the legal fees awarded for the litigation prior to this appeal are reasonable in amount; we leave for determination by the district court on remand whether a further allowance should be made for the expenses incurred on remand. We also allow Monsanto $1,500 for legal expenses on this appeal.

I. The Rationale for an Accounting.

Consideration of the principles which we think should govern the award of an accounting in the present case must begin with § 35 of the Lanham Act, 15 U.S.C. § 1117, which provides for the award of damages and accounts for the infringement of marks registered under the Act. The trademark plaintiff is entitled under § 35 to recover, "subject to the principles of equity,"

"(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action * * In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court

shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty."

On its face, § 35 would seem to give a district court the broadest kind of discretion in tailoring the plaintiff's recovery, whether in damages or by way of an accounting, to the facts of the particular case. Compare Trade-Mark Act of 1905, § 19, 33 Stat. 729. So far as accountings are concerned, however, recourse to this broad discretion has been considered by a number of courts, including this one, to be limited by the nature of the right asserted by the trademark plaintiff.

■ The more narrow view of the right has been that it is merely a means of protecting a businessman from injury resulting from another's use of his mark. Durable Toy & Novelty Corp. v. J. Chein & Co., 133 F.2d 853 (2 Cir.), cert. denied, 320 U.S. 211, 63 S.Ct. 1447, 87 L.Ed. 1849 (1943). Injunctive relief may be warranted by the mere possibility of such injury, but a monetary award, whether in the form of damages or an accounting, is justified only to the extent that injury is shown already to have been suffered. This has been the conventional view, see Note, 1963 Wash.U.L.Q. 243, and it is the view underlying the decisions of this court relied on by Judge McLean in this case.

There is nothing in this view of the trademark right which entitles the plaintiff to the infringer's profits as such. An accounting has been thought proper only as an indirect measure of the plaintiff's injury, that is, only if some relationship between the infringer's profits and the plaintiff's injury can be inferred. As a result accountings have been limited to cases in which the parties are competing for trade and the defendant's trade may thus be presumed to have been diverted from the plaintiff. This is the rule adopted by the Restatement of Torts, § 747.

An alternative view of the trademark right is that it is a form of property, similar in this respect to a copyright or patent right. Taking this view, the justification for an accounting is found in the principles of unjust enrichment traditionally applicable where property is used for profit without the owner's permission, and, if the view is carried to its logical conclusion, an accounting should be awarded automatically in most cases. In particular, since the accounting is not dependent upon presumed injury to the plaintiff, it is irrelevant that the plaintiff was not selling in the market exploited by the infringer. See the discussion of patent and copyright accountings in Sammons v. Colonial Press, Inc., 126 F.2d 341, 344–346 (1 Cir. 1942).

There is direct support for the property right view in the decision of the First Circuit in Baker v. Simmons Co., 325 F.2d 580, 582 (1963),[2] and more ambiguous support in decisions of the Tenth[3] and Third[4] Circuits. It also is

---

2. A portion of the defendant's business was competitive with the plaintiff but a substantial portion—about 40 per cent—was not. The court upheld an accounting as to the profits from the entire business.

3. Blue Bell Co. v. Frontier Refining Co., 213 F.2d 354, 362–363 (10 Cir. 1954). The parties were both gasoline distributors but in different states. The decision at least stands for the rule, discussed later in this opinion, that an accounting may be allowed where the parties market the same product in different geographical areas; and the court's reference to "consuming market" and "trade territory" 1949), accounting approved on appeal

and its citation of Dad's Root Beer Co. v. Doc's Beverages, Inc., 193 F.2d 77 (2 Cir. 1951), as supporting authority suggest that the decision stands for no more than this. On the other hand, the accounting was expressly grounded on "the equitable principle of unjust enrichment, not the legal theory of provable damages," and Dad's Root Beer was bolstered by citation of copyright accounting cases.

4. See Century Distilling Co. v. Continental Distilling Corp., 86 F.Supp. 503 (E.D.Pa. from subsequent order, 205 F.2d 140 (3 Cir.), cert. denied, 346 U.S. 900, 74 S.Ct. 226, 98 L.Ed. 400 (1953). The

supported by the language of the Supreme Court in Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 259, 36 S.Ct. 269, 272, 60 L.Ed. 629 (1916):

> "The right to use a trademark is recognized as a kind of property, of which the owner is entitled to the exclusive enjoyment to the extent that it has been actually used [Citations omitted.] The infringer is required in equity to account for and yield up his gains to the true owner, upon a principle analogous to that which charges a trustee with the profits acquired by wrongful use of the property of the *cestui que trust.*"

Since the parties in Hamilton-Brown were competitors, the implications of the Court's language were not tested,[5] however, and Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947), subsequently established that competition between the parties at least does not automatically entitle the trademark plaintiff to an accounting.

## II

### The Prior Decisions of This Court.

This court has rejected in explicit terms the view that a trademark right is a form of intangible property, Durable Toy & Novelty Corp. v. J. Chein & Co., supra, and has also rejected the argument that the broad language of § 35 allows a district court to award an accounting where the parties are not competitors. Admiral Corp. v. Penco, Inc., supra, 203 F.2d at 521; Triangle Publications, Inc. v. Rohrlich, supra, 167 F. 2d at 974. The rationale for this interpretation was that § 35 allows accountings "subject to the principles of equity,"

which were considered in Admiral and Triangle Publications to include the requirement that the parties be competitors.

While this court has required that the parties market similar products, Admiral Corp. v. Penco, Inc., supra; Triangle Publications, Inc. v. Rohrlich, supra, it has not required that they market their products in the same geographical area. Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 545 (2 Cir. 1956); Dad's Root Beer v. Doc's Beverages, 193 F.2d 77, 82–83 (2 Cir. 1951). The genesis of this distinction was in Dad's Root Beer. The plaintiff marketed Dad's Old Fashioned Root Beer in the Chicago area and sold franchise rights and concentrate for other parts of the country. The defendant operated in the New York area, where it had at first marketed Dad's Root Beer under a franchise from the plaintiff but later began to market its own product, Doc's Old Fashioned Root Beer. Although the parties did not directly compete as to beverage sales, the district court ordered an accounting of the defendant's profits from such sales, and this court affirmed. Judge Clark wrote:

> "As the district judge pointed out, it is well settled in equity that a trademark infringer is liable as trustee for profits accruing from his illegal acts, even though the owner was not doing business in the consuming market where the infringement occurred. [Citations omitted.] * * True, recovery of defendant's profits seems thus far to have been associated with the working hypothesis that they are a valid measure of plaintiff's lost sales. [Citations

---

plaintiff and defendant sold a "cheap whiskey" and a "quality gin" respectively. 205 F.2d at 144. It is not clear whether the district court regarded the competition between the two as sufficient, even though not direct, or whether it simply did not consider competition to be necessary for an accounting. The Third Circuit approved the accounting without expressly considering this problem.

5. Both parties manufactured shoes and there were areas in which both sold. However, it appears that there also were some states in which the defendants but not the plaintiff sold. See Lawrence-Williams Co. v. Societe Enfants Gombault, 52 F.2d 774, 777 (6 Cir. 1931). The possible implications of the fact that an accounting was nevertheless allowed as to the defendant's entire profits are discussed below.

omitted.] This affirmation does not of itself require the negative, however—that without direct competition in the same geographic area there can be no recovery of profits. We think the force of the precedents cited, re-enforced by the widely quoted and applied federal rule, leads to the contrary conclusion.

For it is well settled that the court 'will endeavor to adapt its relief to the general equities of the particular situation, as nearly as it is possible to do so,' in designing relief for unfair competition * * * Here, * * * mutual dealings and a contractual business relationship existed prior to an unexcused program of palming off which was intended to, and did, result in purchase-confusion. Of course, plaintiff also had the loss of its franchise commissions and concentrate sales which it was enjoying until defendants substituted spurious 'Old Fashioned' root beer for the trademarked product. Moreover, plaintiff suffered through the possible deterioration of its advertising effectiveness by the appearance on the public market of a similarly named, but separate, product of the same substantial make-up. A limitation of plaintiff's remedies to an injunction against further appropriation of its labels, devices, and advertising good will, leaving to the defendants the actual profits made through their wrongful acts, would be inequitable and contrary to the general state [sic] principles." Id. at 82–83.[6]

In the opinion of this court and of the district court in Dad's Root Beer three cases are cited for the proposition that an accounting may be ordered where the parties sell similar products in different areas but not where they sell different products: Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., supra; Lawrence-Williams Co. v. Societe Enfants Gombault, 52 F.2d 774 (6 Cir. 1931); and L. P. Larson, Jr. Co. v. William Wrigley, Jr. Co., 20 F.2d 830 (7 Cir. 1927), rev'd on another point, 277 U.S. 97, 48 S.Ct. 449, 72 L.Ed. 800 (1928). Whether these cases stand for any such general rule is at least highly doubtful. There is no hint of the product market-geographical market distinction in the Hamilton-Brown opinion; the Supreme Court referred only to recovery on an unjust enrichment theory. The court in Lawrence-Williams, however, offered in dicta an interpretation of Hamilton-Brown which differed from the Supreme Court's language. It observed that the Hamilton-Brown briefs and record revealed that there were states in which the defendant sold but the plaintiff did not. Since all of the defendant's profits were included in the accounting, the Lawrence-Williams court inferred that,

> "The principle seems to be that as to territory unreached by plaintiff's trade, it may be inferred that there was a latent demand for plaintiff's goods which it would eventually have supplied, except for the infringement, and hence it has sufficient equitable right to the infringer's profits." Id. 52 F.2d at 777.

Lawrence-Williams stands only as a somewhat questionable interpretation, in dicta, of Hamilton-Brown; the interpretation is justified only if it is assumed that the Supreme Court allowed the accounting on the theory that it measured diversion of trade and not on the theory of unjust enrichment to which its opinion referred. The Seventh Circuit in L. P. Larson, on the other hand, did expressly allow an accounting for areas in which the defendant but not the plaintiff was selling. However, the court did not draw a general distinction between geographical separation and product differentia-

---

6. Although Judge Clark wrote for the court in the quoted passage, the other two judges on the panel did not join in an earlier part of the opinion, in which Judge Clark expressed his view that the Lanham Act was applicable. All agreed, however, that the same result would follow under either federal or state law 193 F.2d at 82.

tion; rather it found that the defendant's predatory business tactics had prevented the plaintiff from expanding, and it therefore held that, "under the very exceptional circumstances here appearing," it would be inequitable to deny an accounting simply because the plaintiff had been unable to extend its sales into all of the areas in which the defendant sold.

At the least, the product market-geographical market distinction can hardly be said to be well-established in the law of trademarks. Nor does the distinction derive much support from the rationale of Dad's Root Beer itself. Since Judge Clark justified the accounting by enumerating various injuries which the plaintiff suffered or may have suffered—loss of franchise commissions, loss of concentrate sales, deterioration of advertising effectiveness—the rationale is in theory consistent with the view that an accounting is justified only as compensation, although it is not consistent with § 747 of the Restatement of Torts. However, there apparently was no direct proof that any of these injuries was in fact suffered, much less that they approximated in amount the defendant's profits.[7] And, more important, the rationale has little if anything to do with any distinction between product and geographical markets; the same arguments could have been advanced in favor of an accounting if the plaintiff had not been distributing root beer anywhere in the country but was merely selling franchises and concentrate.

### III.  The Need for an Accounting.

The prior decisions of this court thus rest on two divergent lines of reasoning, divided as to their application by a line which has little to do with either. On one hand there are Durable Toy, Triangle Publications, and Admiral, which would allow an accounting only where a diversion of sales may reasonably be inferred. On the other hand there are Dad's Root Beer and Maternally Yours, which refer to the traditional discretion of a court of equity in adapting its relief to the case before it.

We conclude that the latter rationale is the proper one under § 35 of the Lanham Act. That this rationale accords better with the language of § 35 is evident, and it is further supported by comparison of § 35 with the less generous language of its predecessor, § 19 of the Trade-Mark Act of 1905, 33 Stat. 729.[8] We also think that it is more suited to the general purposes of the Lanham Act.

In enacting the Lanham Act, Congress observed that any trademark statute had a two-fold purpose:

"One is to protect the public so it may be confident that, in purchasing a product bearing a particular trademark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats." S.Rep. No. 1333, 79th Cong., 2d Sess. 1–2 (1946), in U.S. Code Cong.Serv. 1274 (1946).

We think it doubtful whether even the second of these purposes, protection of the trademark owner, is adequately served by a rule which would allow accountings only where the parties directly compete. To have proved directly that the reputation of its Acrilan trademark was injured by Perfect Fit's activities, Monsanto would have been required first to trace the pads from Perfect Fit through the retailer to their ultimate purchasers and then to introduce, in some manner or another, the testimony of a sampling of these purchasers in court.

7. The plaintiff had waived its right to prove damages "other than those resulting from profits which may have been made by the defendants." 94 F.Supp. 121 (S.D.N.Y.1950).

8. Section 19 empowered a trial court in its discretion to award up to treble damages, but, unlike § 35, it did not expressly confer a similar power to vary the amount recovered in an accounting.

Cf. Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F.Supp. 670 (S.D.N.Y.1963) (use of opinion poll). Whether Monsanto tried to obtain such evidence and failed or simply did not try does not appear. However, it seems obvious that there must have been some economic injury to Monsanto, such as loss of sales to legitimate producers and the loss of the goodwill of some of the retail purchasers of Perfect Fit's inferior "Acrilan" mattress pads.

In any event, whatever may be the merit of the narrow rule regarding accountings so far as the trademark owner is concerned, the narrow rule is entirely inadequate to protect the interest of the public. Because the amount involved in a single purchase may be small —here $3.98 for a mattress pad—the ultimate purchaser almost never brings suit even in so blatant a case of deception as here, and the public must depend for protection on the private actions brought by trademark owners.[9] While private actions such as this do not compensate those who purchased the infringer's product, they can deter future infringements by imposing a money judgment on the defendant. The principal defect of the § 747 rule is that it does nothing to render infringement unprofitable in cases such as this. The plaintiff is unable to offer satisfactory proof of its injury, and, so long as the defendant does not infringe the trademark of a direct competitor, it can retain its profits.[10]

There can be no doubt as to the need for deterrence in cases such as this. Perfect Fit has, it appears, taken up trademark infringement as its principal line of business. In at least three other instances it has carried out schemes similar to its misuse of the Acrilan trademark. It may be said to be a commercial racketeer. We quote from Judge McLean's findings, based on uncontradicted evidence:

"In 1957 defendant entered into a contract with Celanese Corporation of America which authorized defendant to use the trade-mark 'Celacloud' on mattress pads ' * * only when the stuffing material in the goods is 10% Type F acetate staple manufactured by or for Celanese * * *' Subsequently, Celanese purchased and tested two of defendant's mattress pads labeled 'Celacloud' without reference to any other fibers, and discovered that neither contained 100% Type F Celanese acetate, but that one contained 50% waste material and one 29.64% rayon. In view of the tests, Celanese terminated the agreement and demanded that defendant recall from its customers all 'Celacloud' labeled products. Defendant replied to Celanese that the alleged failure could have only occurred through inadvertence of an employee of the Carolina Manufacturing Company. Subsequently, Celanese purchased and tested one more of defendant's mattress pads and found it to be materially adulterated. Thereupon Celanese instituted an action against defendant in the Supreme Court of New York and moved for a preliminary injunction. Defendant then consented to a judgment without payment for any damages sustained by Celanese or an accounting of its profits.

"After entry of the consent injunction in the Celanese case early in 1958 and the preliminary injunction in this case late in 1958, defendant in 1959 marketed mattress pads labeled 'DuPont nylon filled' and 'All new materials consisting of synthetic fibers.' The Better Business

---

9. The Lanham Act does not provide criminal penalties for trademark infringement. See 15 U.S.C. §§ 1114–1120.

10. In fact, Monsanto is already considerably out of pocket in prosecuting this action. Its actual expenses have amounted to about approximately $90,000, of which only about $16,000 was covered by the district court's award for legal expenses.

Bureau investigated these mattress pads and found that they contained no nylon whatsoever and 59.2 per cent cotton which is not a synthetic fiber.

"Beginning in 1958 and continuing into 1963, defendant marketed mattress pads with labels reading: 'Filling 100% Estron' or 'All 'Estron' Acetate Filling Fiber,' 'Estron' being the trademark of Tennessee Eastman Company for its acetate fiber. Plaintiff's analytical tests on two of these pads established that the pads contained less than 60 per cent acetate."

■■ We do not hold that it is irrelevant whether the parties are in direct competition; compensation for diverted trade is one important purpose which an accounting may serve. To restrict accountings to this single purpose, however, fails to take account of the other purposes served by the trademark law. Under the circumstances of this case, a judgment limited to an injunction is clearly inadequate to deter those who deliberately engage in commercial piracy which defrauds thousands of consumers and injures a trade name built up at considerable cost by legitimate means.

The judgment of the district court is reversed and the case is remanded for an accounting.[11]

MOORE, Circuit Judge (concurring and dissenting):

Although I concur in the result, namely, that the case should be reversed and remanded, I cannot subscribe to the reasons advanced by the majority for so doing or the limited relief granted, i. e., "an accounting of the defendant's profits." From the facts as found by the trial court, I have no hesitation in concluding that defendant should be required to respond to such damages within the trial court's discretion as may be jus-

tified by the proof. The trial court itself might well have reached this result had it not felt bound by decisions of this court which it interpreted as holding "that in such a situation [where the parties are not competitors] an accounting of profits may not be allowed * * *" Accordingly, the court concluded (Concl. of Law 7), "Since the parties are not competitors, plaintiff is not entitled to an accounting of defendant's profits."

I find nothing in the statute, 15 U.S. C.A. § 1117 (§ 35, Lanham Act) which premises recovery upon the existence of a competitive situation. A plaintiff is specifically entitled "to recover (1) defendant's profits" and is told that he need "prove defendant's sales only," leaving to the defendant to "prove all elements of cost or deduction claimed." In addition, a plaintiff may recover "(2) any damages sustained by the plaintiff." Thus, if a defendant were to prove slight profit or none, the plaintiff might gain a hollow victory. However, "damages sustained" might be established on some factual basis or theory other than "defendant's profits." For example, would it be too farfetched to hold defendant here to its statements to the public that its mattress pads were filled with "acrilan"? If equity would now do that which ought to have been done, plaintiff might have as damages its profit on "acrilan" sales to defendant in such quantities as would have been necessary to fill the pads with genuine "acrilan" and not floor sweepings and waste material or damages on the theory of unjust enrichment. Furthermore, the statute permits the court, if "the amount of the recovery based on profits is either inadequate or excessive," in its discretion to "enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." Therefore, on remand the trial court should be free to enter a judgment upon such equitable basis as may be warranted by the proof.

11. All the active circuit judges have been advised of this opinion and no one of them has requested in banc consideration.

In Admiral Corporation v. Price Vacuum Stores (E.D.Pa.1956), 141 F.Supp. 796, 801, the court commented that:

"It seems scarcely equitable, however, for an infringer to reap the benefits of a trademark he has stolen, force the registrant to the expense and delay of litigation, and then escape payment of damages on the theory that the registrant suffered no loss. To impose on the infringer nothing more serious than an injunction when he is caught is a tacit invitation to other infringement."

In Blue Bell Co. v. Frontier Ref. Co., 213 F.2d 354, 363 (10th Cir. 1954), the court stated that "recovery is predicated upon the equitable principle of unjust enrichment, not the legal theory of provable damages." That decision has since been cited approvingly by this court in Maternally Yours, Inc. v. Your Maternity Shop, 234 F.2d 538, 545 (2d Cir. 1956). See also 4 Callman, Unfair Competition and Trade-Marks 1860 & n. 74 (2d ed. 1950). Thus, the fact that plaintiff was not in direct competition with defendant or may not have lost sales directly to defendant is not so relevant to the propriety of an accounting of profits as they are to an award of damages. Compare Vandenburgh, Trademark Law and Procedure 386 & n. 17 (1959), with id. 385 & n. 11.

Plaintiff undoubtedly has been adversely affected by defendant's unlawful infringement. Defendant, in turn, has made sales of mattress pads and at least to this extent has unjustly enriched itself. Equity requires that the barrier, if such it be, of the Rohrlich and Penco cases be surmounted. The law must keep pace with industrial and economic reality. Today products sold on a nationwide basis contain scores of component parts manufactured by others. In the textile and synthetic fiber field particularly, chemical and textile companies produce fibers under such trademarked names as "nylon," "dacron," "orlon," "caprolan," "creslan," "kodel," "lycra," and many others, which are not sold to the purchasing public as such but are important and well-advertised ingredients of many household articles and articles of apparel.

Wherever equity is the basis for relief, each case must, of necessity, be decided on its own facts and damages measured accordingly. The unjust enrichment may be the defendant's profits. The damages sustained by plaintiff may be gauged by the profit it would have made had "acrilan" actually been used in the pads sold. No formula should be decreed which would lessen the trial court's discretion as to how best to achieve a fair award. Our present task is to remove the barrier which the trial court felt existed and to try to set up certain directional arrows.

I find it unnecessary to overrule cases previously decided based upon facts differing from those here presented. Nor, in my opinion, is there any need to consider or discuss "product market—geographical market" distinctions. No facts giving rise to these questions are before us in this case.

I, therefore, concur in reversal and remand, but dissent from the limitation of remand merely "for an accounting of defendant's profits."